UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| EMILY HERX, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO: 1:12-CV-122-RLM-RBC |
| | ) |
| DIOCESE OF FORT WAYNE- | ) |
| SOUTH BEND INC. AND ST. VINCENT | ) |
| DE PAUL SCHOOL, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS DISMISSING PLAINTIFF'S COMPLAINT**

**I. INTRODUCTION**

Defendants, Diocese of Fort Wayne – South Bend, Inc. and St. Vincent de Paul School ("the School") (collectively referred to as "the Diocese"), by counsel, file this Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings Dismissing Plaintiff's Complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff, Emily Herx ("Herx"), filed her Complaint and Demand for Jury Trial ("Complaint") on April 20, 2011, bringing claims against the Diocese based upon alleged violations of Title VII of the Civil Rights Act of 1964, as amended, including the Pregnancy Discrimination Act, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and Title I of the Americans with Disabilities Act, 42 U.S.C. §12010, *et seq*. ("ADA"). Both Title VII and the ADA provide exceptions/defenses for religious employers, such as the Diocese.

The Diocese asserts two (2) reasons why Herx's Complaint should be dismissed. First, the Complaint should be dismissed due to Herx's inability to pursue her claims as a result of the religious employer/entity exceptions/defenses under Title VII and the ADA. Second, if those

exceptions/defenses do not bar Herx from recovery, the Complaint should be dismissed due to the unconstitutionality of Title VII and the ADA as they are now being applied

## II. THE LEGAL STANDARD

A motion for judgment on the pleadings may be granted only if the moving party clearly establishes that no material issue of fact remains to be resolved and that he or she is entitled to judgment as a matter of law. National Fidelity Life Insurance Co. v. Karganis, 811 F.2d 357, 358 (7th Cir. 1987) citing Flora v. Home Fed. Savings & Loan Ass'n, 685 F.2d 209, 211 (7th Cir. 1982). The court may consider only matters presented in the pleadings and must view the facts in the light most favorable to the nonmoving party. Id. The court, however, is not bound by the nonmoving party's legal characterizations of the facts. Id.

It s settled that a motion for a judgment on the pleadings is a motion for a judgment on the merits. Collins v. Bolton, 287 F. Supp. 393, 396 (N.D. Ill. 1968) citing 2 A MOORE'S, FEDERAL PRACTICE ¶12.15 and Roemhild v. Jones, 239 F.2d 492 (8th Cir. 1957).

The legal standard applicable to a Trial Rule 12(c) judgment on the pleadings requires that, beyond doubt, the non-movant can provide no facts supporting the claim for relief. Eddie D. Church and Cherri Church v. Power Press Sales Company, Inc., 74 F.3d 795, 798 (7th Cir. 1996).

Based upon the pleadings at issue in this case, the Diocese contends this standard has been met and Herx's Complaint should be dismissed as a matter of law.

## III. THE UNDISPUTED MATERIAL FACTS

The undisputed material facts relating to the Diocese's Rule 12(c) motion are:

1)   The Diocese is a Catholic religious corporation.

2)   The School is a part of the Diocese and is a Catholic religious educational institution.

3)      Herx was employed by the Diocese as a teacher at the School.

4)      Herx's Regular Teacher Contract as a teacher at the School provided that Herx agreed to conduct herself at all times, personally and professionally in accordance with the episcopal teaching authority, law and governance of the Church.

5)      It is a religious teaching of the Catholic Church, readily found in the catechism of the Catholic Church, that in vitro fertilization ("IVF") is contrary to the teachings of the Church and is gravely immoral.

6)      Herx's teaching contract with the Diocese was not renewed because she and her husband engaged in IVF treatments, which treatment the Diocesan Bishop described as "an intrinsic evil," which no circumstances can justify.

Because the undisputed material facts show that the Diocese is a religious corporation and decided to not renew Herx's contract for religious reasons, the case should be dismissed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## IV. THE TITLE VII EXCEPTION

Title VII provides an exception from coverage for religions employers, as follows:

> This Subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. §2000e-1.

The intent, scope and legality of the Title VII religious employer exception has been the subject of prior court decisions. For present purposes, one of the most notable rulings came from the United States Supreme Court in Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, et al. v. Amos, et al., 483 U.S. 327, 107 S. Ct. 3862, 97 L.Ed2d 273 (1987).

The lead plaintiff in Amos, who had been employed by one of the defendant religious employers for 16 years as an assistant building engineer in a Church operated gymnasium that was open to the public, was terminated from his job when he failed to qualify for a temple recommend, due to his lack of observance of church set standards. Amos, 483 U.S. at 330. He, and others, filed an action against the religious employers claiming, among other things, discrimination on the basis of religion in violation of Title VII. Id. The religious employers moved to dismiss the Title VII claims on the basis of the religious employer exception. Id. The plaintiffs responded by claiming that since the jobs they performed for the religious employers were secular in nature, to allow discrimination on religious grounds based on the religious employer exception as amended in 1972 would violate the Establishment Clause of the Constitution of the United States. Id. Prior to the 1972 amendment, that religious employer exception applied only to the religious activities of religious organizations. Id. at 333, n.9. The lower court agreed with the plaintiffs and ruled that Title VII's religious employer exception, as amended, was unconstitutional as applied to secular activity of a religious employer since, among other things, it impermissibly granted the religious employer an opportunity to advance its religious standards with regard to employees performing non-religious work. 483 U.S. at 333.

On review, the Supreme Court reversed the lower court. 483 U.S. at 340. It ruled that as applied to the non-profit activities of a religious employer, Title VII's amended religious employer exception better enables religious organizations to advance their purposes, but does not impermissibly establish a benefit for the religious employer to the detriment of its employees performing secular work. 483 U.S. at 336, 339. It found that the exception was "rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of

religious organizations to define and carry out their religious missions." 483 U.S. at 339. Finally, the Court determined that the exception did not entangle church and state, but effectuated "a more complete separation" of church and state. Id.

The Supreme Court's support for broad coverage of that religious employer exception is not surprising given the constitutional issues that would otherwise come to the surface if courts were to become enmeshed in consideration of a religious employer's religiously based employment decisions under the guise of a Title VII discrimination claim. In such a circumstance, "the interest in protecting the free exercise of religion embodied in the First Amendment to the Constitution prevails over the interest in ending discrimination embodied in Title VII." Young v. The Northern Conference of United Methodist Church, et al., 21F.3d 184, 185 (7th Cir. 1994); cert denied (Title VII lawsuit dismissed since inquiry related to claim of sex discrimination regarding denial of application for church position would violate First Amendment).

## V. FURTHER CONSTITUTIONAL ANALYSIS

Concern for unconstitutional entanglement also led the Supreme Court to rule that the National Labor Relations Board ("the Board") could not exercise jurisdiction over the Diocese's high schools in National Labor Relations Board v. Catholic Bishop of Chicago, et al., 440 U.S. 490, 99 S. Ct 1313, 59 L.Ed2d 533 (1979). In that case, the Board attempted to exercise jurisdiction under the National Labor Relations Act ("NLRA") over lay faculty members of certain high schools, some operated by the Diocese. Catholic Bishop of Chicago, 440 U.S. at 491-493. The Diocese's high schools provide a religiously oriented secular education with mandatory religious training. Id. at 492-93. The Board presumed it had jurisdiction due to the fact that the schools at issue were not completely religious, but only religiously associated. Id. at 493. The defendant religious

5

organizations, including the Diocese, claimed that they were outside the Board's jurisdiction and that the Religion Clauses of the First Amendment prevented the Board from exercising jurisdiction. Id.

The Supreme Court recognized up front that the grant of jurisdiction to the Board would lead to the need for analysis of constitutional issues. The Court's concern with regard to the potential for constitutional issues included the prospect of the Board's resolution of unfair labor practices related to decisions mandated by religious creeds, as to which the Court stated:

> The resolution of such charges by the Board, in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy - administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights granted by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.

Id. at 502. (footnote omitted).

The Court concluded that the potential for conflicts under the First Amendment was inevitable if it were to extend the Board's jurisdiction to include lay teachers of church-operated schools that engage in the propagation of faith, stating:

> The church-teacher relationship in a church-operated school differs from the employment relationship in a public or other non-religious school. We see no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that would follow. We therefore turn to an examination of the National Labor Relations Act to decide whether it must be read to confer jurisdiction that would in turn require a decision on the constitutional claims raised by respondents.

Id. at 504.

Given that assessment, the Court first looked to "whether Congress intended the Board to have jurisdiction over teachers in church-operated schools." Id. at 499. It reviewed the legislative

history of the NLRA and ultimately determined that since there was no clear expression of Congressional intent to extend Board jurisdiction over lay teachers in church-operated schools, it declined to construe the NLRA to include such jurisdiction, thereby avoiding the constitutional issues. Id. at 507.

Whether approached from the broad scope that must be afforded Title VII's express exceptions granted by Congress regarding a religious employer's religiously based employment decisions, or from the need to avoid any construction of a federal law that would thrust those decisions into a constitutionally prohibited analysis, the end result is the same. A religious employer's religiously based decisions related to its employees engaged in nonprofit activities must be afforded the full protections granted by way of the First Amendment.

That conclusion was the guiding premise utilized by the Third Circuit in the lay teacher contract nonrenewal dispute presented in Little v. Wuerl, 929 F.2d 944 (3rd Cir. 1991). The plaintiff in Little was a non-Catholic teacher in a Catholic grade school who raised a religious discrimination claim under Title VII when her employment contract was not renewed due to her remarriage, a union which was considered to be a rejection of Church doctrine and laws. 929 F.2d at 945-46. Similar to Herx's Contract, the employment contract in Little read, in part:

> Teacher recognizes the religious nature of the Catholic School and agrees that Employer has the right to dismiss a teacher for serious public immorality, public scandal, or public rejection of the official teachings, doctrine or laws of the Roman Catholic Church, thereby terminating any and all rights that the Teacher may have hereunder, subject, however, to the personal due process rights promulgated by the Roman Catholic Church.

Little, 929 F.2d at 945.

In <u>Little</u>, the court's analysis of the case focused on whether the religious employer could discriminate against a non-Catholic employee because of conduct contrary to Church standards. <u>Id.</u> The court began its analysis with reference to the Supreme Court's guidance in <u>Catholic Bishop of Chicago</u> - - that before extending jurisdiction under Title VII to cover a religious employer's religiously based decision, the court must first consider if the coverage would raise substantial constitutional issues and, if so, did Congress clearly express an intent to apply the law in this type of circumstance. <u>Id.</u> 929 F.2d at 947. The court readily determined that application of Title VII's prohibition of religious discrimination to the contract nonrenewal decision at issue "would arguably violate both the free exercise clause and establishment clause of the first amendment." <u>Id.</u> The court determined that review of the nonrenewal decision would necessarily engage it in an analysis of what constitutes "the official teachings, doctrine or laws of the Roman Catholic Church" and whether such were rejected by the plaintiff. 929 F2d at 948.

The court also decided that applying Title VII's religious discrimination prohibition to the religious employer could result in excessive government entanglement violating the Establishment Clause. In this regard, the court cited to <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 91 S. Ct. 2105, 29 L.Ed2d 745 (1971) for the proposition that the Establishment Clause prohibited state aid to parochial schools since the ability to separate secular education provided by a parochial school teacher from the sectarian education provided by that same teacher would involve excessive government supervision in matters of religious education. <u>Little</u>, 929 F.2d at 948-49.

## VI. THE LEGISLATIVE HISTORY SUPPORTS THE TITLE VII EXCEPTION ASSERTED BY THE DIOCESE

As a result of the constitutional issues that would be raised by application of the religious discrimination provision of Title VII to the nonrenewal decision, the court in <u>Little</u> then looked to the issue of Congressional intent. The starting point for that analysis was the religious employer exception found at 42 U.S.C. §2000e-1.

As originally worded, the exception covered:

> a religious corporation, association, or society with respect to employment of individuals of a articular religion to perform work connected with the carrying on by such corporation, association or society <u>of its religious activities</u> or to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution.

42 U.S.C. §2000e-1 (emphasis added).

However, the <u>Little</u> court found it important to note that the range of the exception was broadened when amended in 1972 to cover the religious employer's <u>non-religious</u> activities as follows:

> This Subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. §2000e-1.

The Court also found it instructive that Title VII contained another, similar exception applicable to religious educational organizations which provides that:

> it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such [institution] is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular

9

> religious corporation, association, or society, or if the curriculum of such [institution] is directed towards the propagation of a particular religion.

42 U.S.C. §2000e-2(e)(2). Little, 929 F.2d at 950.

The court's analysis of the meaning of the words "of a particular religion" as referenced in the exceptions was critical to the outcome of that case. That issue centered on whether that phrase referenced only a denominational affiliation or whether it had other religious significance. Little, 929 F.2d at 950. The court's review of the legislative history of the law did not expose any direct reference to that phrase, but did provide a comment by a sponsor, as follows:

> The establishment of church-related educational institutions is the embodiment of the free exercise of religion. This form of religious activity has always been recognized to occupy the same high estate under the first amendment as worshiping in the churches and preaching from the pulpits.

118 Cong. Rec. 1994 (1972) (Senator Allen). Id.

Further, the court noted the following exchange involving another sponsor:

> [Question]: Does the Senator's amendment limit itself to the opportunity of a religious organization to have the right to hire people of its own faith? Is that the limitation of the amendment?
>
> Senator Ervin: I would allow the religious corporation to do what it pleased. That is what my amendment would allow it to do. It would allow liberty. It would take it out from under the control of the EEOC entirely.

118 Cong. Rec. 1982 (1972). Id.

Taking all of these factors into consideration, the court determined it appropriate to give a broad meaning to the words "of a particular religion", leading to the dismissal of the Title VII claim:

> We recognize that Congress intended Title VII to free individual workers from religious prejudice. But we are also persuaded that

> Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's "religious activities." Against this background and with sensitivity to the constitutional concerns that would be raised to a contrary interpretation, we read the exemption broadly. We conclude that the permission to employ persons "of a particular religion" includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts. Thus, it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic or non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles. We therefore hold that the exemptions to Title VII cover the Parish's decision not to rehire Little because of her remarriage.

Little, 929 F.2d at 951.

## VII. HERX'S TITLE VII CLAIM SHOULD BE DISMISSED BASED UPON THE PLEADINGS

Herx's claim is almost identical to the claim brought by the plaintiff in Little and should be likewise dismissed. The pleadings in this case identify alleged "facts" which place Herx's Title VII claims squarely within the "Constitutionality mandated analysis" referenced in the Amos, Catholic Bishop of Chicago, and Little decisions. Herx was a teacher in a Catholic elementary school. (Complaint, ¶¶18; Answer, introduction at page 1, ¶18 and Exhibit A thereto.) There is no legitimate dispute regarding the religious nature of Diocesan schools. Catholic Bishop of Chicago, 440 U.S. at 492-93. Moreover, Herx's Contract explicitly references the religious nature of the employment:

> Acknowledging and accepting the religious and moral nature of the Church's teaching mission, the undersigned agrees to conduct herself or himself at all times, professionally and personally, in accordance with the episcopal teaching authority, law, and governance of the Church in this Diocese.

(Answer, Ex. A.)

11

Herx's Contract also provides that it " may be terminated prior to its expiration, or not renewed, for reasons relating to improprieties regarding Church teachings or laws." Id. Finally, the Contract provides that "Charges of immoral behavior, or of conduct violative of the Teachings of the Church shall ultimately be resolved exclusively by the Bishop, or his designee, as provided in Diocesan Educational Policies." Id.

Herx and her husband chose to engage in in vitro fertilization procedures. (Complaint ¶16.) Herx met with Monsignor John Kuzmich, the Pastor of St. Vincent de Parish, regarding the in vitro fertilization procedures in which she and her husband were engaged and, subsequently, Herx was notified that her Contract would not be renewed due to "improprieties related to Church teachings or laws". (Complaint ¶¶20 and 24; Answer ¶¶20 and 24.) Herx's father wrote to the Diocese's Bishop, The Most Reverend Kevin C. Rhoades, regarding the Nonrenewal decision. (Complaint ¶32; Answer ¶32.) The Bishop determined that the nonrenewal decision would stand, specifically noting that Herx and her husband were engaged in a procedure, in vitro fertilization, that was in violation of Church Teachings as expressed in the catechism of the Catholic Church. (Complaint ¶33; Answer ¶¶32 and 33; Exhibit B) These "facts", taken from the pleadings and presumed true for purposes of this Motion, lay the groundwork for the dismissal of Herx's Title VII based claims against the Diocese.

It makes no difference that Herx claims she was discriminated against on the basis of her sex or pregnancy status. It cannot reasonably be disputed that the basis of the decision to not renew her Contract was religious. A religious employer's religiously based decisions are included within the religious employer exceptions to Title VII. To find otherwise would subject the religiously based nonrenewal decision, ultimately upheld by the Bishop, to the type of constitutionally proscribed

analysis described in Amos, Catholic Bishop of Chicago and Little. The issue is not Herx's sex or pregnancy status, but only the specific medical procedure, proscribed by Church Teachings, in which Herx and her husband engaged. Further, allowing Herx's claims to proceed would undoubtably lead to inquiry into the good faith of religious based decisions that the Supreme Court stated would impinge on rights granted by the Religion Clauses. Catholic Bishop of Chicago, 440 U.S. at 502.

The nature of the impermissible intrusion that Herx proposes occur in this case is clear from the pleadings. Herx attempts to establish persons "similarly suited" to her with reference to Diocesan teachers based upon criteria such as their Catholic faith or regular Mass attendance, (Complaint, ¶37); divorce (Id. ¶38); receipt of hysterectomies, vasectomies, tubal ligation or other fertility/reproduction related treatments (Id. at 39); and use of contraceptives. (Complaint ¶40.) Probing into Church Teachings related to such matters, and evaluating or judging a pastor's or the Bishop's moral assessment of religious standards relative to such matters, is prohibited by the First Amendment.

Given the religiously motivated reason for the nonrenewal of her Contract, there can be no facts available to make Herx's Title VII claim viable. The analysis of the law applicable to this case leaves no doubt that Herx's Title VII claim against the Diocese is not novel as compared to the religiously based decisions at issue in Amos and Little. The end result here should be the same as in Little. Herx's Title VII claim should be dismissed.

## VIII.  HERX'S CLAIM UNDER THE ADA SHOULD ALSO BE DISMISSED ON THE PLEADINGS

Using the same legal analysis applicable to Title VII's religious employer exceptions and relying on the even more specific religious entities defenses included within the more recently adopted ADA, Herx's ADA claim should also be dismissed on the pleadings.  The Diocese's religiously based contract nonrenewal decision may not be analyzed or judged due to the constitutionally prohibited entanglement issues that assessment would raise.  Moreover, the intent of Congress to avoid those constitutional issues by excluding such decisions from governmental inquiry is expressly stated within the ADA.

The Diocese will not repeat here the full legal analysis properly utilized by a court when confronted with consideration of religious issues that could be brought into question under the ADA.  The same analysis described in Amos and Little, relative to Title VII, and in Catholic Bishop of Chicago, relative to the NLRA, would be applicable to the ADA.  The existence of those substantial constitutional issues is real, and, therefore, the next step is to determine Congressional intent.  The Religious entities defenses built into the ADA make that analysis easy.     The ADA, originally adopted into law in 1990, long after Title VII, includes two (2) defenses under the heading of "Religious entities", as follows:

> **(1) In general.**  This title shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.
>
> **(2) Religious tenets requirement.**  Under this title, a religious organization may require that all applicants and employees conform to the religious tenets of such organization.

42 U.S.C. §12113(d)(1) and (d)(2).

The clear and unambiguous wording of those coverage exceptions leaves no doubt that the Congress intended for religious employers to be free to make religiously based hiring decisions <u>and</u> religious tenet adherence based employment decisions without regard to the restrictions otherwise imposed by the ADA. The fact that the later enacted ADA specifically includes the religious tenets requirement defense shows that the Congress appreciated the Supreme Court's broad reading of Title VII's religious employer exception in <u>Amos</u>. Rather than amend Title VII to restrict the scope of the religious employer exception in response to the <u>Amos</u> outcome, the Congress intentionally expressed religious defenses in the ADA to meet the <u>Amos</u> standard thereby better avoiding constitutional challenges.

For present purposes, the Religious entities defenses in the ADA clearly provide the basis for the dismissal of Herx's ADA claim against the Diocese on the pleadings. Herx claims to suffer from, and contends that at all relevant times the Diocese knew she suffered from, what she alleges is an ADA covered disability, infertility. (Complaint ¶¶16 and 60.) However, taking those allegations and that conclusion as true for purposes of this Motion, Herx's ADA claim should be dismissed since the Diocese's reason for the nonrenewal of Herx's Contract was due to "improprieties related to Church Teachings or laws" as the result of Herx and her husband engaging in in vitro fertilization procedures, which is contrary to Church teachings. (Complaint ¶¶24, 31and 33; Answer ¶¶24, 31 and 33 and Exhibit B.) Infertility is not the issue in this case. In his letter to Herx's father, Bishop Rhoades referenced Church approved fertility procedures. (Answer, Exhibit B.)

The proper issue to consider in this case is whether the Diocese, as a religious employer, can make religiously based employment decisions, including those based upon a requirement that an employee, such as Herx, conform to its religious tenets, without restriction under the ADA. The Religious entities defenses built into the ADA leave no doubt that the answer to that question is "Yes". Moreover, even allowing inquiry into the religious validity or the good faith of the basis for the nonrenewal decision would lead to the same type of prohibited impingement of rights granted by the Religion Clauses as noted in Catholic Bishop of Chicago, supra. Therefore, any "facts" that Herx may present to bolster her claims, including those related to her proffered "similarly situated" Diocesan employees, would only draw the case further into confrontation with the Constitution. Accordingly, Herx's ADA claim should be dismissed.

### IX.  IF HERX'S TITLE VII AND ADA CLAIMS ARE DETERMINED TO BE NOT SUBJECT TO DISMISSAL BASED UPON THE RELIGIOUS EXCEPTION/DEFENSES PROVIDED IN TITLE VII AND THE ADA, THESE STATUTES ARE UNCONSTITUTIONAL

Both Title VII and the ADA include legislatively enacted religious employer/entity exceptions/defenses to prevent excessive government entanglement with religious matters in violation of the Free Exercise and Establishment Clause of the Constitution. In Amos, the Supreme Court reversed the lower court's holding that Title VII's religious employer's exception was itself unconstitutional on the theory that it acted to impermissibly establish religion. Amos, 483 U.S. at 340. In the Supreme Court's view, the opposite was true. Title VII's religious employer exception did not establish religion. Rather, it offered a more complete and necessary means of avoiding improper entanglement with religious matters. Id. at 339.

In Catholic Bishop of Chicago, to avoid a clash with the First Amendment rights of religious employers, including the Diocese, related to an extension of Board jurisdiction under the NLRA over lay teachers, the Supreme Court created an exception from jurisdiction for Catholic schools. That exception was due to the religious nature of the schools and the lack of any Congressional intent to indicate that the law was intended to cover such schools. 440 U.S. at 499, 507.

The judicial and legislative efforts to avoid constitutional challenges to federal laws related to a religious employer's religiously based employment decisions are obvious. Title VII and the ADA, as written, and as reviewed in the judicial forum, should be determined to exempt the Diocese's decision to not renew Herx's contract due to improprieties related to Church Teachings or laws.

To find that the Diocese's religiously based nonrenewal decision of Herx's Contract is not covered by Title VII's religious employer exceptions, as written and as treated by the Supreme Court in Amos and the Third Circuit in Little, and by the religious entities defenses of the ADA, would draw the constitutionality of Title VII and the ADA into issue. Allowing the litigation of the religious issues challenged by Herx would necessarily act to inhibit religious employers from acting on the dictates of conscious and religious values and, in this case, involve excessive entanglement and intrusion into religious matters regarding the meaning and validity of Church Teachings, the Diocese's enforcement of religious requirements imposed on its employees, the moral assessment of assorted types of employee conduct in accord with Church teachings, the core religious values that the Diocese seeks to maintain within its schools as part of its religiously based educational mission, and a host of other religious decision matters.

Ignoring the legislatively enacted and constitutionally required relief valves for religiously based decisions by religious employers, as Herx seeks to apply Title VII and the ADA, would result in Title VII and the ADA being unconstitutional since each would have principal or primary effects that inhibit the free exercise of religion and impermissibly invite intrusion by the federal government into religious matters in violation of the standards expressed by the Supreme Court in <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971) (to pass muster under a Constitutional assessment, the "statute must have a secular legislative purpose, . . . its principal or primary effect must be one that neither advances nor inhibits religion, . . . and the statute must not foster 'an excessive government entanglement with religion' ".) (internal citations omitted). Further, that result would fly in the face of the great pains exercised by the Supreme Court in <u>Amos</u> and <u>Catholic Bishop of Chicago</u> to avoid such an outcome.

Simply allowing Herx's case to proceed would act to chill the constitutionally protected right of the Diocese, including its pastors, to make religiously based employment decisions without fear of subsequent governmental entanglement and review. No pastor should have to defer in making, or delay making, a religiously based decision to the detriment of fulfilling the Diocese's religious mission for that reason. The fact that Herx, or others, disagree with or do not approve of the Church Teachings related to matters, such as in vitro fertilization, does not provide a legitimate, constitutionally sound means of questioning employment decisions made by the Diocese based on those Teachings. As previously noted, comparing the relative importance of the anti-discrimination protection extended to individuals under Title VII, and the ADA, to the rights granted to the Diocese under the Free Exercise and Establishment Clauses of the Constitution leaves no room for doubt that the Diocese's constitutional rights must prevail. See <u>Young</u>, 21 F.3d at 185.

18

# X. CONCLUSION

The religious exceptions to Title VII and the ADA clearly provide that the Diocese is not subject to these statutes with respect to the employment decision in this case. If Herx is correct that these exceptions do not operate to exclude the decision making of the Diocese from Title VII and ADA review, Title VII and the ADA are unconstitutional as now applied because they violate the Free Exercise Clause and Establishment Clause of the First Amendment of the Constitution and cause excessive government entanglement in religion.

WHEREFORE, the Diocese respectfully requests that Herx's Complaint be dismissed in its entirety with prejudice and that the Diocese be granted all other relief available to it under the circumstances.

Respectfully submitted,

HALL & GOODEN LLP


s/ Scott Hall
Scott Hall, #12060-49
810 South Calhoun Street, Suite 100
Fort Wayne, IN 46802
Telephone: (260) 422-2035
Fax: (260) 424-2541
Attorney for Defendants

THEISEN BOWERS & ASSOCIATES, LLC


s/ John C. Theisen
John C. Theisen, #549-02
810 South Calhoun Street, Suite 200
Fort Wayne, IN 46802
Telephone: (260) 422-4255
Facsimile: (260) 422-4245
Attorney for Defendants

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using its CM/ECF system this 21st day of June, 2012, which will send notification of such filing to the following CM/ECF recipients:

Kathleen A. DeLaney , Esq.
Sarah Elizabeth Caldwell, Esq.
DeLaney & DeLaney LLC
3646 Washington Blvd
Indianapolis, IN 46205

                                              s/ Scott Hall
                                             Scott Hall