# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| EMILY HERX, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) CAUSE NO. 1:12-CV-122-RLM-RBC |
| V. | ) |
| | ) |
| DIOCESE OF FORT WAYNE- | ) |
| SOUTH BEND INC. AND ST.VINCENT | ) |
| DE PAUL SCHOOL, | ) |
| | ) |
| DEFENDANTS. | ) |

**BRIEF OF *AMICUS CURIAE* AMERICAN CIVIL LIBERTIES UNION IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS DISMISSING <u>PLAINTIFF'S COMPLAINT</u>**

The American Civil Liberties Union (ACLU) is a national, nonprofit, nonpartisan organization with more than 500,000 members dedicated to the principles embodied in the Constitution and the nation's civil rights laws. The ACLU has long fought for the fundamental right of religious freedom, and regularly brings cases aimed at protecting the right to religious exercise and expression. At the same time, the ACLU is committed to fighting discrimination and inequality, including discrimination based on sex. The ACLU has worked for decades to ensure that all women and girls are able to lead lives of dignity, free from discrimination. An important component of gender equality is the ability to have full control over one's reproductive life, and to be able to decide whether and when to have children. This includes the freedom to access health care to further those reproductive choices, without fear of reprisal from an employer who disagrees with those choices.

The ACLU has a significant interest in the proper resolution of this case and submits this brief to highlight the exceptional nature of the broad statutory and constitutional exemptions Defendants seek. If granted, these exemptions would give religiously affiliated employers

1

essentially *carte blanche* to discriminate based on sex, race, national origin, and disability. No court has ever recognized the expansive exemptions to Title VII and the ADA that Defendants propose and for good reason. Excluding religiously affiliated employers from the mandates of antidiscrimination statutes would threaten decades of progress achieved by these important statutes and would render innumerable employees working in religiously affiliated organizations vulnerable to discrimination. While Defendants certainly have the right to their religious beliefs, the law does not permit them to use those beliefs to infringe upon the rights of others and to discriminate based on those views.

## BACKGROUND

Emily Herx was a Language Arts and Literature teacher at St. Vincent de Paul, a Catholic school, from 2003 until 2011. (Dkt. 1 ¶¶ 8, 9.) She was not a minister nor was she involved in teaching religious studies. (*Id.* ¶¶ 10, 12, 13, 15.) When Ms. Herx and her husband decided to expand their family, she learned she suffered from infertility. (*Id.* ¶ 16.) In 2010, with the knowledge and support of her supervisor, Ms. Herx completed a first round of in vitro fertilization (IVF) to get pregnant. (*Id.* ¶ 17.) After advising her supervisor of her IVF treatment, Ms. Herx's teaching contract was renewed for the 2010-11 school year. (*Id.* ¶18.) Unfortunately, the first round of IVF was unsuccessful and when Ms. Herx requested time off for a second round, she was terminated. (*Id.* ¶¶ 19-22, 24.) At that point, Monsignor Kuzmich told Ms. Herx that, according to the teachings of the Catholic Church, IVF is a gravely immoral medical procedure. (Dkt. 14 ¶ 22.) Bishop Rhoades later added that IVF "very frequently involves the deliberate destruction or freezing of human embryos . . . [and] is an intrinsic evil, which means that no circumstances can justify it." (*Id.* ¶ 33.) It is undisputed that Ms. Herx's "performance as a teacher of Language Arts had nothing to do with the decision to not renew her

Contract." (*Id.* ¶ 30.) Rather, she was terminated solely for her decision to use IVF to become pregnant. Ms. Herx filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC), alleging discrimination on the basis of sex and disability. (Dkt. 1 ¶ 44.) After investigating her charges, the EEOC issued a Determination in Ms. Herx's favor and issued a Notice of Right to Sue. (Dkt. 5; Dkt. 1 ¶¶ 45, 46.) Ms. Herx filed a complaint in this Court under Title VII of the Civil Rights Act of 1964 and Title I of the Americans with Disabilities Act (ADA). Defendants have moved for judgment on the pleadings dismissing Plaintiff's Complaint, arguing they are wholly exempt from Title VII and the ADA because they are a religiously affiliated employer, and that to the extent the statutes do not exempt them, the statutes are unconstitutional.

## ARGUMENT

The primary question presented by Defendants' motion is whether a religiously affiliated school is permitted to discriminate against a lay teacher on the basis of her sex or disability, where other employers would face liability for engaging in such discrimination. Courts have held that discriminating against employees who become pregnant (including those who used IVF) amounts to impermissible sex discrimination under Title VII, our nation's principal workplace civil rights statute. Courts have also held that discriminating against employees who seek treatment for a disability (like seeking IVF treatment for infertility) violates the ADA. Defendants admit that they terminated Ms. Herx solely because she used IVF to get pregnant. This is simply illegal. Neither the statutes nor the Constitution give religiously affiliated employers a blanket right to discriminate against lay employees on the basis of sex or disability, even if motivated by sincerely held religious beliefs.

3

First, as a long line of cases confirm, Title VII prohibits all employers, including religiously affiliated ones like Defendants, from discriminating against lay employees on the basis of sex, regardless of their motivation. The ADA likewise proscribes religiously affiliated employers from discriminating on the basis of disability. In drafting both Title VII and the ADA, Congress specifically contemplated and rejected broad exemptions that would have entirely excluded religiously affiliated employers from the antidiscrimination mandates. Instead, it adopted narrow exemptions in both statutes, allowing religiously affiliated employers to discriminate only on the basis of the employee's religion. Second, courts have repeatedly held that enforcing neutral antidiscrimination statutes like Title VII and the ADA against religiously affiliated employers with respect to lay employees does not run afoul of the First Amendment.

I. **The Statutory Exemptions of Title VII and the ADA Do Not Permit Religiously Affiliated Employers to Discriminate on the Basis of Sex or Disability.**

   A. *Title VII's exemption in § 702 does not permit discrimination on the basis of sex, race, or national origin.*

Title VII is a comprehensive statutory scheme intended to "prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin, and . . . its policy of outlawing such discrimination [is of] the 'highest priority.'" *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 763 (1976) (citations omitted). As amended by the Pregnancy Discrimination Act, Title VII also defines sex discrimination to include discrimination on the basis of pregnancy. Pregnancy Discrimination Act, Pub. L. No. 95-955, 92 Stat. 2076 (1978). Because only women can get pregnant, discrimination on the basis of pregnancy is, by definition, discrimination on the basis of sex. *Int'l Union v. Johnson Controls, Inc.*, 499 U.S. 187, 197 (1991) ("The policy excludes women with childbearing capacity . . . and so creates a facial classification based on gender."). And it follows that discrimination for using IVF to get pregnant is necessarily discrimination on the

4

basis of sex because "[e]mployees terminated for taking time off to undergo IVF—just like those terminated for taking time off to give birth or receive other pregnancy-related care—will always be women." *Hall v. Nalco Co.*, 534 F.3d 644, 648-49 (7th Cir. 2008) (holding that an employee terminated for seeking IVF treatment stated a cognizable sex discrimination claim and reversing grant of defendant's motion for summary judgment).

Title VII's narrow statutory exemption—§ 702—upon which Defendants rely, permits religiously affiliated employers to favor only co-religionists. But it does not permit them to discriminate on the basis of sex, race, or national origin. The exemption states:

> This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals *of a particular religion* to perform work connected with carrying on by such corporation, association, educational institution, or society of its activities.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 (2012) (emphasis added). This exemption is narrow, as many courts have observed:

> While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin. The statutory exemption applies to one particular reason for employment decision—that based upon religious preference.

*Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985) (citation omitted), *cert. denied*, 478 U.S. 1020 (1986); *see also E.E.O.C. v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1277 (9th Cir. 1982) (holding same), *abrogated on other grounds by Alcazar v. Corp. of Catholic Archbishop of Seattle*, 598 F.3d 668 (9th Cir. 2010); *Elbaz v. Congregation Beth Judea, Inc.*, 812 F. Supp. 802, 807 (N.D. Ill. 1992) ("By its very terms, § 2000e-1 applies only to discrimination on the basis of religion. The ban on discrimination in employment on account of race, national origin, or sex is still applicable to religious

5

organizations.") (citation and quotations omitted); *Dolter v. Wahlert High Sch.*, 483 F. Supp. 266, 269 (N.D. Iowa 1980) (holding same); U.S. Equal Employment Opportunity Commission, Questions and Answers: Religious Discrimination in the Workplace (January 31, 2011), http://www.eeoc.gov/policy/ docs/qanda_religion.html ("Under Title VII, religious organizations are permitted to give employment preference to members of their own religion. . . . The exception does not allow religious organizations otherwise to discriminate in employment on the basis of race, color, national origin, sex, age, or disability. Thus, a religious organization is not permitted to engage in racially discriminatory hiring by asserting that a tenet of its religious beliefs is not associating with people of other races.").[1]

Although Title VII's plain text and courts' longstanding interpretation of that text leave no doubt, the legislative history also makes clear that Congress considered and rejected a blanket exemption for religiously affiliated employers. Congress instead chose an exemption that balances the First Amendment rights of such employers with the government's compelling interest in eradicating discrimination. The original version of Title VII passed by the House, H.R. 7152, included a broad exemption, entirely excluding religiously affiliated employers from the statute. *See Pac. Press*, 676 F.2d at 1276 (discussing legislative history of Civil Rights Act of 1964 and citing H.R. Rep. No. 914, 88th Cong., 1st Sess. 10 (1963), reprinted in EEOC, *Legislative History of Title VII and XI of Civil Rights Act of 1964* (1968), 1964 U.S. Code Cong. & Ad. News p. 2355). A substitute bill permitting religiously affiliated employers to discriminate on the basis of religion—but not on the basis of sex, race, or national origin—with respect to religious activities was passed by the Senate and House, and signed into law. *Id*.

---

[1] Defendants cite *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987), which only highlights the limited scope of § 702. In *Amos,* a building engineer performing secular duties at a gymnasium associated with the Church of Latter-Day Saints was terminated because he was no longer in good standing with the Church. That is, he was terminated *on the basis of his religion* by a religiously affiliated entity, which is explicitly permitted by § 702.

6

Years later, in 1972, members of Congress once more proposed a blanket exemption for religiously affiliated employers, which was again rejected in favor of an amended exemption to permit religiously affiliated employers to discriminate on the basis of religion with respect to all (not just religious) activities. *Id.* at 1277. This is the exemption that is codified in the current version of Title VII.

This legislative history confirms that Congress affirmatively intended to include religiously affiliated employers within the general scope of Title VII, giving them only a narrow exemption to make employment decisions based on the employee's religion. *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993) ("As several courts have noted, the legislative history of Title VII makes clear that Congress formulated the limited exemptions for religious institutions to discriminate based on religion with the understanding that provisions relating to non-religious discrimination would apply to such institutions.") (citing *Martin v. United Way of Erie County*, 829 F.2d 445, 449 (3d Cir. 1987); *Rayburn*, 772 F.2d at 1166). Nevertheless, religiously affiliated employers like Defendants have repeatedly tried to expand the scope of § 702's exemption and escape Title VII's prohibitions on sex, race, and national origin discrimination. But those efforts have failed. Indeed, Defendants have not identified—because they cannot—a single case in which a court has expanded § 702 to permit a religiously affiliated employer to discriminate against lay employees based on a protected characteristic other than religion.[2]

---

[2] The only case Defendants cite, *Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991), does not change the analysis. First, *Little* is entirely consistent with other courts' interpretations of Title VII. The *Little* court explicitly noted that "Title VII has been interpreted to bar race and sex discrimination by religious organizations towards their non-minister employees." *Id.* at 947-48 (citations omitted). Second, the plaintiff in *Little* was a non-Catholic teacher who was terminated by her Catholic employer after remarrying without getting her previous marriage annulled by the Catholic Church. *Id.* at 946. That is, *Little* did not involve any allegations of sex, race, or national origin discrimination.

7

A religiously affiliated employer's religious motivation for discriminatory conduct does not convert unlawful sex discrimination into permissible religious discrimination. Court after court—including this one—has rejected such arguments. *E.E.O.C. v. First Baptist Church*, No. S91-179M, 1992 WL 247584 (N.D. Ind. June 8, 1992) (Miller, J.). In *First Baptist*, a religiously affiliated school argued that it did not violate the Equal Pay Act even though it paid male teachers more than their female counterparts. The school argued that because its compensation practices were "motivated by a religious belief that husbands have primary responsibility for providing for the family," this was a permissible factor "other than sex" under the statute. *Id.* at *5. This Court properly rejected the school's argument, holding that a policy that discriminates on the basis of sex—even if rooted in a religious belief—is still sex discrimination:

> Since the Church's head of household allowance policy is based on sex—albeit as a means of observing a religious belief that men and women occupy different roles within the family—any argument that the policy is based on a factor "other than sex" within the meaning of the EPA must fail.

*Id.* (citing *E.E.O.C. v. Tree of Life Sch.*, 751 F. Supp. 700, 709 (S.D. Ohio 1990)); *see also Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 350 (E.D.N.Y. 1998) ("[I]t remains fundamental that religious motives may not be a mask for sex discrimination in the workplace."); *Vigars v. Valley Christian Ctr. of Dublin, Cal.*, 805 F. Supp. 802, 807 (N.D. Cal. 1992) ("[C]hurch organizations have been held liable under Title VII for benefit and employment decisions which they contended were based upon religious grounds but which also discriminated against women based upon sex."). So too here, Defendants terminated Ms. Herx because of her decision to use IVF to get pregnant. Defendants' underlying religious beliefs about IVF do not transform this impermissible sex discrimination into permissible religious discrimination.

8

### B. The defenses under Title I of the ADA are likewise narrow and do not permit religiously affiliated employers to discriminate on the basis of disability.

The ADA was intended "'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities,' said by Congress to be 43 million in number and growing." *Vande Zande v. State of Wis. Dep't. of Admin.*, 44 F.3d 538, 541 (7th Cir. 1995) (quoting 24 U.S.C. § 12101(a), (b)(1) (2012)). "[L]awmakers made clear that the ADA was norm-changing legislation, akin to the legislative turning points in this country's struggle to overcome racial discrimination . . . . Unlike other legislation designed to settle narrow issues of law, the ADA has a comprehensive reach and should be interpreted with this goal in mind." *Anderson v. Gus Mayer Boston Store of Del.*, 924 F. Supp. 763, 771 (E.D. Tex. 1996) (citations and emphasis omitted). As amended by the ADA Amendments Act of 2008, the ADA includes infertility as a disability because infertility substantially limits major bodily functions. ADA Amendments Act of 2008, Pub. L. No. 110-325 § 3(2)(B), 122 Stat. 3553 (2008) (amending "major bodily functions" to include "reproductive functions"). *See also Yindee v. CCH, Inc.*, 458 F.3d 599, 601 (7th Cir. 2006) (recognizing infertility as a disability). The Centers for Disease Control and Prevention estimates that today about ten percent of American women (6.1 million) suffer from infertility. U.S. Department of Health & Human Services Office on Women's Health, *Infertility Fact Sheet* 1 (2009), http://www.womenshealth.gov/publications/our-publications/fact-sheet/infertility.pdf. Title I of the ADA prohibits employment discrimination on the basis of disability, and terminating an employee for seeking treatment for a disability (like IVF addresses infertility) is not permitted. 42 U.S.C. § 12111 *et seq.* (2012).

Just as with Title VII of the Civil Rights Act of 1964, Title I of the ADA contains narrow defenses for religiously affiliated employers:

> (1) In general
>
>> This subchapter shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to individuals *of a particular religion* to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.
>
> (2) Religious tenets requirement
>
>> Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of such organization.

42 U.S.C. § 12113(d) (2012) (emphasis added). The first defense (like § 702 in Title VII) permits a religiously affiliated employer to exercise a preference in favor of co-religionists. The second permits such employers to require employees to follow the religious tenets of the organization. Neither provides religiously affiliated employers a blanket exemption to discriminate on the basis of disability.

The structure of the ADA demonstrates that Title I of the ADA does not give religiously affiliated employers a blanket license to discriminate against the disabled. Title III of the ADA—which prohibits disability discrimination in the provision of public accommodations and services—contains a blanket exemption for religiously affiliated entities, stating that "[t]he provisions of this subchapter [Title III] shall not apply to . . . religious organizations or entities controlled by religious organizations, including places of worship." 42 U.S.C. § 12187 (2012). This broad exemption is a marked contrast to the narrow carve-outs provided to religiously affiliated employers under Title I of the ADA. If Congress intended to similarly exempt religiously affiliated employers broadly from the reach of Title I, it could have done so by including the same broad exemption used in Title III. It did not, and instead gave religiously affiliated employers only narrow defenses based on the employee's religiosity.

The legislative history also shows that just as with Title VII, Congress considered and rejected a broad exemption to the ADA that would have entirely excluded religiously affiliated employers. *See* 136 Cong. Rec. H2599-01, H2630-31 (May 22, 1990) (statement of Rep. Lindsay) (proposing failed amendment exempting religious organizations from the definition of "employer"). Instead, Congress granted religiously affiliated employers only narrow exemptions while ensuring that they remained subject to the ADA's core prohibition of disability discrimination.

Interpreting the ADA's defenses to permit disability discrimination because of the employer's religious opposition to a medical treatment could create an exemption that is capable of swallowing the entire rule. Under Defendants' interpretation, for example, a religiously affiliated charity opposed to blood transfusions could terminate employees who receive bone marrow transplants to treat leukemia. To interpret the Act in this way would run contrary to the statute's purposes, one of which is "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2) (2012). Defendants terminated Ms. Herx solely for her decision to treat her infertility with IVF. This is plainly illegal under the ADA and is not excused by Defendants' sincerely held religious beliefs.

II. **The First Amendment Does Not Entitle a Religiously Affiliated Employer to Discriminate Against Lay Employees on the Basis of Sex, Race, National Origin, or Disability.**

Courts have long held that the First Amendment is not offended by enforcing neutral antidiscrimination statutes against religiously affiliated employers with respect to lay employees. Nor does the First Amendment provide Defendants refuge for discrimination. First, there can be no question that the antidiscrimination statutes at issue are neutral, generally applicable, and do

not target religious exercise. Moreover, the minimal burden imposed by these statutes on a religiously affiliated employer's free exercise is outweighed by the compelling state interest in eradicating discrimination. Second, enforcing these statutes against religiously affiliated employers would not create an excessive entanglement of religion because the government's investigation into a discrimination claim is limited in time and scope, and does not require an evaluation of religious doctrine. As this Court put it, "[g]overnment regulation should not be held unconstitutional simply because it may in some way affect the otherwise unfettered operation of a religious institution." *First Baptist*, 1992 WL 247584, at *7.

> **A.** ***Enforcement of Title VII and the ADA against religiously affiliated employers does not violate the Free Exercise Clause.***

Since *Employment Division v. Smith*, "[r]egulations of general applicability, not intended to discriminate against a religion or a particular religious sect, [do] not . . . violate the free exercise clause." [3] *Grayson v. Schuler*, 666 F.3d 450, 452 (7th Cir. 2012) (citing *Employment Division v. Smith*, 494 U.S. 872 (1990)). Even if one particular religion is uniquely burdened by a statute, that does not mean the statute is *intended* to discriminate against that religion such that heightened judicial scrutiny of the statute is required. *See Bloch v. Frischholz*, 587 F.3d 771, 785 (7th Cir. 2009) ("*Smith* requires more than just evidence of an adverse impact on [religious believers]. . . . Under *Smith*, the denial of a religious exception is not intentional discrimination."). It cannot be disputed that Title VII and the ADA are neutral laws of general applicability, nor can it be disputed that they do not specifically target anyone's religious beliefs.

---

[3] Defendants never invoke the ministerial exemption, which recognizes that the First Amendment requires religious organizations to be free to make employment decisions concerning their ministers without government involvement. *Hosanna-Tabor v. E.E.O.C.*, 565 U.S. __, 132 S.Ct. 694 (2012). Defendants' silence in this regard is understandable, as Ms. Herx could not possibly be deemed a minister for purposes of that narrow exception. Defendants admit that Ms. Herx was hired as a Language Arts and Literature teacher (Dkt. 14 ¶ 11), has not been ordained by the Catholic Church and does not hold a title within the Catholic Church or Diocese (*id.* ¶ 12), and has never held herself out to be a minister (*id.* ¶ 13). Nor did Ms. Herx teach religion classes, lead an all school Mass, or engage in any religious instruction. (Dkt. 1 ¶ 10).

12

*See Vigars*, 805 F. Supp. at 809 ("Title VII neither regulates religious beliefs, nor burdens religious acts, *because* of their religious motivation. On the contrary, it is clear that Title VII is a secular, neutral statute . . . ."). Accordingly, enforcement of these statutes against Defendants for sex and disability discrimination does not violate Defendants' free exercise of religion.

Even under the heightened pre-*Smith* standard—which required a compelling government interest to justify a burden on free exercise—courts (including this one) sustained neutral antidiscrimination laws in the face of free exercise challenges. These courts held that any burden on the free exercise of religion imposed by an antidiscrimination statute is outweighed by the compelling state interest in eradicating discrimination and promoting equality. *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (enforcing IRS rule prohibiting segregation against religiously affiliated university because "the Government has a fundamental, overriding interest in eradicating racial discrimination in education . . . .[which] outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs"); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1398 (4th Cir. 1990) (enforcement of the Fair Labor Standards Act against religiously affiliated entities does not violate the entities' free exercise rights); *E.E.O.C. v. Fremont Christian Sch.*, 781 F.2d 1362, 1367-69 (9th Cir. 1985) ("Because the impact on religious belief or practice is minimal and the interest in equal employment opportunities is high, the balance weighs heavily in favor of upholding [defendant's] liability under Title VII for its sexually discriminatory health insurance compensation program.") (citing *Pac. Press*, 676 F.2d at 1279); *E.E.O.C. v. Miss. Coll.*, 626 F.2d 477, 489 (5th Cir. 1980) ("We conclude the government's compelling interest in eradicating discrimination is sufficient to justify the minimal burden imposed upon the College's free exercise of religious beliefs that results from the application of Title VII."); *Starkman v. Evans*,

18 F. Supp. 2d 630 (E.D. La. 1998) (absent ministerial functions, Free Exercise Clause does not bar enforcement of the ADA), *aff'd* 198 F.3d 173 (5th Cir. 1999); *First Baptist*, 1992 WL 247584, at *7-8 (applying pre-*Smith* standard and finding no free exercise violation by enforcing the Equal Pay Act against a religiously affiliated school). If those challenges failed under a higher level of scrutiny, then Defendants' claims must inevitably fail here, too.

> **B.** ***Enforcing Title VII and the ADA against religiously affiliated employers does not create an excessive entanglement of religion, in violation of the Establishment Clause.***

Courts have been sustaining discrimination actions brought by lay employees against religiously affiliated employers for decades without creating an excessive entanglement of religion. This is because identifying impermissible discrimination against a lay employee does not require an examination of the employer's religious doctrine. To determine whether a statue creates an excessive entanglement of religion, courts examine (1) the character and purpose of the intrusion, (2) the nature of the statute's intrusion into the church's affairs, and (3) the resulting relationship between the government and the religious institution. *Lemon v. Kurtzman*, 403 U.S. 602, 615 (1971). "The potential for ongoing entanglement or continuous supervision of church affairs by the government's regulation is the critical entanglement issue which deserves the most emphasis." *Pac. Press*, 676 F.2d at 1282.

In employment discrimination actions the relationship between the government and the employer is narrow in both time and scope. Courts are asked to investigate an isolated employment related decision, many times in connection with an individual employee. This minimal intrusion does not rise to the level of an "excessive entanglement" that threatens the Establishment Clause. *See, e.g., DeMarco*, 4 F.3d at 172 (enforcement of Age Discrimination in Employment Act against religiously affiliated school does not create an excessive entanglement); *Elbaz*, 812 F. Supp. at 808 ("This court's adjudication of strictly sex- or national origin-based

discrimination issues would not to any degree entangle us in the Congregation's religious mission, doctrines, or activities, and thus would not violate the religion clauses of the First Amendment."); *Vigars*, 805 F. Supp. at 809 ("[N]either a judgment in this suit nor the enforcement mechanism of Title VII in general results in any ongoing scrutiny of the school's operations."). This is consistent with the longstanding principle that the government "violates no constitutional rights by merely investigating the circumstances of [an employee's] discharge . . . if only to ascertain whether the ascribed religious-based reason was in fact the reason for the discharge." *Ohio Civil Rights Comm'n v. Dayton Christian Sch. Inc.*, 477 U.S. 619, 628 (1986). This case involves the single decision by Defendants to not renew Ms. Herx's teaching contract, and the Court's role would be isolated to assessing Ms. Herx's sex and disability discrimination claims. This limited relationship would yield no more of an excessive entanglement of religion than did other discrimination suits sustained against religiously affiliated employers. *See, e.g., Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316 (11th Cir. 2012) (allowing Title VII action to proceed through discovery); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000) (same); *Ganzy*, 995 F. Supp. 340 (E.D.N.Y. 1998) (same). If Defendants were correct, then none of these cases could have proceeded beyond the pleading stage, which plainly was not the case.[4]

\*     \*     \*     \*

In today's society, religiously affiliated organizations perform valuable and important services across a wide range of sectors, employing people of all races, genders, religions and

---

[4] In fact, as this Court noted, "[s]uch a blanket exclusion [of religiously affiliated employers] . . . would raise Establishment Clause concerns of its own. The Establishment Clause does not merely prevent the endorsement of one religion over another, it prevents governmental endorsement or preference of religion generally." *First Baptist*, 1992 WL 247584, at \*11 (citing *Texas Monthly v. Bullock*, 489 U.S. 1, 8 (1989)); *see also Dolter*, 483 F. Supp. at 269 ("[T]o construe section 2000e-1 to exempt All Forms [sic] of discrimination in sectarian schools would itself raise first amendment problems since it would imply the government's special preference of sectarian schools over nonsectarian schools.") (citing *King's Garden Inc. v. FCC*, 498 F.2d 51, 54-57 (D.C. Cir. 1974)).

backgrounds. Entirely exempting such organizations from neutral antidiscrimination statutes would have far-reaching effects and seriously threaten the progress legislatures, courts, and society have achieved towards eliminating discrimination and advancing equality.

Today, there are at least 600 hospitals,[5] 23,000 schools and colleges,[6] and 20,000 charities[7] affiliated with religious entities. Together these organizations employ more than 1.1 million people across the United States.[8] Defendants demand an exemption that would eliminate employment discrimination protections for these 1.1 million people and permit more than 40,000 employers to discriminate freely. Not only would such an exemption impact the employees working in such organizations, but the social effects would also be widespread given that religious organizations are affiliated with prominent hospitals, schools, colleges, and charities across the country. Defendants' position would take this country back to a time when, prior to the passage of Title VII and the ADA, religiously affiliated schools could refuse to hire teachers with HIV based on the religious belief that the virus indicates moral uncleanliness; religiously affiliated hospitals could discriminate against African-American doctors based on the religious belief that the races should not integrate; and religiously affiliated charities could fire women after becoming pregnant based on the religious belief that women should stay at home with their children. But since the passage of Title VII and the ADA, these types of discrimination are impermissible, regardless of whether motivated by sincere religious beliefs.

---

[5] Catholic Health Association of the United States, *Catholic Health Care in the United States* (2012), http://www.chausa.org/Pages/Newsroom/Fast_Facts/ ("*Catholic Health Care*").
[6] Steven P. Broughman et al., National Center for Education Statistics, *Characteristics of Private Schools in the United States: Results from the 2009 – 10 Private School Universe Survey* 7 (NCES 2011 – 339, 2011), http://nces.ed.gov/pubs2011/2011339.pdf ("*Characteristics of Private Schools*"); Council for Christian Colleges & Universities, *Profile of Post-Secondary Education*, (2010), https://www.cccu.org/filefolder/Profile_US_Post-Secondary_Education-updated2010.pdf.
[7] Paul Arnsberg & Mike Graham, *Charities, Fraternal Beneficiary Societies, and Other Tax Exempt Organizations, 2008* 5, (2011), http://www.irs.gov/pub/irs-soi/11eofallbulteorg.pdf.
[8] *See Characteristics of Private Schools* at 7; *Catholic Health Care* at 2; The Salvation Army, *2011 Salvation Army*, (2011), http://www.salvationarmyusa.org/images/usn.www_usn_2/Statistics2011.jpg; Catholic Charities USA, *Catholic Charities At A Glance*, (2012), http://www.catholiccharitiesusa.org/document.doc?id=2853.

This Court has already come to the conclusion that the Constitution does not grant religiously affiliated organizations *carte blanche* to discriminate against lay employees and it should do so again here.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for judgment on the pleadings should be denied.

Respectfully submitted,

/s/ Jennifer K. Lee

Jennifer K. Lee
Bar No.: NY 4876272
Brigitte Amiri*
Ariela Migdal*
Daniel Mach*
*\* pro hac vice forthcoming*

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2601
Facsimile: (212) 549-2651
Email: jlee@aclu.org

*Counsel for Amicus Curiae*

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a copy of the foregoing was filed electronically on the 17th day of September, 2012. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system, who may access this filing through the Court's system:

Scott Hall, Esq.
Hall & Gooden LLP
810 South Calhoun Street, Suite 100
Fort Wayne, IN 46802
shall@hallgooden.com

John C. Theisen, Esq.
Theisen Bowers & Associates, LLC
810 South Calhoun Street, Suite 200
Fort Wayne, IN 46802
jtheisen@tbalawyers.com

Kathleen A. DeLaney, Esq.
Sarah Elizabeth Caldwell, Esq.
DeLaney & DeLaney LLC
3646 Washington Blvd.
Indianapolis, IN 46205
kathleen@delaneylaw.net
scaldwell@delaneylaw.net

                                                      /s/ Jennifer K. Lee
                                                        Jennifer K. Lee