| | | |
|---|---|---|
| EMILY HERX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO: 1:12-CV-122-RLM-RBC |
| | ) | |
| DIOCESE OF FORT WAYNE- | ) | |
| SOUTH BEND INC. AND ST. VINCENT | ) | |
| DE PAUL SCHOOL, | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

COME NOW the Defendants, Diocese of Fort Wayne – South Bend, Inc. and St. Vincent

de Paul School ("the School") (collectively referred to as "the Diocese"), by counsel, and file their

Brief in Support of Defendants' Motion for Summary Judgment pursuant to Rule 56(a) of the

Federal Rules of Civil Procedure and Local Rule 56-1 of the Northern District of Indiana.  Plaintiff

Emily Herx ("Herx") filed her Complaint and Demand for Jury Trial ("Complaint") on April 20,

2011, asserting claims against the Diocese based upon alleged violations of Title VII of the Civil

Rights Act of 1964, as amended, including the Pregnancy Discrimination Act, 42 U. S. C. § 2000

e, *et seq.* ("Title VII"), and Title I of the Americans With Disabilities Act, 42 U. S. C. § 12010, *et*

*seq.* ("ADA").  Both Title VII and the ADA provide express exemptions for religious employers,

such as the Diocese.

The Diocese asserts five (5) separate reasons why Defendants' Motion for Summary Judgment should be granted and Herx's Complaint should be dismissed in its entirety. Those reasons are as follows:

1) The express exemptions for religious employers in Title VII and the ADA preclude Herx's claims against the Diocese, since the decision to not renew Herx's teacher contract at the School was indisputably religiously based.

2) If the religiously based decision to not renew Herx's teacher contract is not precluded from review by the religious employer exemptions under Title VII and the ADA, then those laws are unconstitutional as they are now being applied.

3) Herx's job duties as a teacher at the School should qualify her as a "minister" subject to the ministerial exception defense to both Title VII and the ADA.

4) The undisputed facts prove that neither Herx's sex nor her pregnancy status were factors in the decision to not renew her teacher contract.

5) The undisputed facts prove that Herx's alleged disability was not a factor in the decision to not renew her teacher contract.

## II.    STATEMENT OF MATERIAL FACTS

A detailed statement of material facts on which the Diocese relies is contained in the Appendix: Defendants' Statement of Undisputed Material Facts In Support of Defendants' Motion for Summary Judgment ("Appendix") filed contemporaneously with this Brief. As noted in that Appendix, the Diocese is a religious entity and the School is a private, Catholic elementary school. (App. at ¶¶ 1-2, 4). Herx was employed by the Diocese as a teacher at the School for a total of seven (7) school years between August 2003 and June 2011. (App. at ¶¶ 28-37). Herx signed a

written teacher contract which contained a clause, hereinafter referred to as "the Morals Clause", which provides in pertinent part, as follows:

> TERMS AND CONDITIONS: This contract may be terminated prior to its expiration, or not renewed, for reasons relating to improprieties regarding Church teachings or laws, . . . Acknowledging and accepting the religious and moral nature of the Church's teaching mission, the undersigned agrees to conduct herself or himself at all times, professionally and personally, in accordance with the episcopal teaching authority, law and governance of the Church in this Diocese. Charges of . . . conduct violative of the Teachings of the Church shall ultimately be resolved exclusively by the Bishop, or his designee, as provided in the Diocesan Educational Policies.

(App. at ¶ 7). When she signed her first teacher contract at the School in 2003, Herx knew that her contract required her to follow the teachings of the Church as a condition of employment. (App. at ¶ 27).

The Catholic Church ("Church") teaches that in vitro fertilization (or "IVF") is gravely immoral. (App. at ¶¶ 39-40, 54). Herx and her husband engaged in IVF treatments. (App. at ¶¶ 41, 45). Monsignor John Kuzmich ("Msgr. Kuzmich"), was the pastor of St. Vincent de Paul Parish ("the Parish"). (App. at ¶ 5). After the School's Principal, Sandra Guffey ("Guffey"), told Msgr. Kuzmich on April 11, 2011 of Herx engaging in IVF, Msgr. Kuzmich met with Herx and explained Church teachings on IVF to her. (App. at ¶¶ 6, 38, 41). Despite Msgr. Kuzmich's explanation of Church teachings on IVF, Herx chose to continue the IVF treatments. (App. at ¶ 44). Msgr. Kuzmich determined it necessary to not renew Herx's teacher contract at the School and on April 25, 2011 Herx was notified of the nonrenewal due to "improprieties related to Church teachings or laws." (App. at ¶¶ 46, 49, 50).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the "movant shows that there is no genuine dispute as to

3

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

The party responding to a motion for summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." Morgan v. SVT, LLC, 724 F. 3d. 990, 997 (7th Cir. 2013), quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). When considering a motion for summary judgment, a court may only consider admissible evidence and must disregard bald and conclusory assertions. Bradley v. Work, 154 F. 3d 704, 707 (7th Cir. 1998); Morris v. Ford Motor Co., 2012 U.S. Dist. LEXIS 168423, *5-6 (N. D. Ind. Nov. 28, 2012).

## IV.     ARGUMENT

### A. The Title VII Exceptions

Herx claims she was discriminated against in violation of Title VII, presumably including the Pregnancy Discrimination Act ("PDA"), when Msgr. Kuzmich decided her teaching contract with the School would not be renewed. The Diocese contends that its employment decision regarding Herx was religiously based and, therefore, protected from scrutiny under Title VII and the PDA. The statute provides two (2) express exemptions from coverage applicable to a religious employer, such as the Diocese, and a religious school, such as the School, as follows:

> This subchapter shall not apply to . . . a religious corporation, association,
> education institution or society with respect to the employment of individuals
> of a particular religion to perform work connected with the carrying on by

4

such corporation, association, education institution, or society of its activities.

42 U.S.C. § 2000e-1(a).

Notwithstanding any other provision of this subchapter, . . . it shall not be an unlawful employment practice for a school . . . to hire and employ employees of a particular religion if such school . . . is, in whole or substantial part, owed, supported, controlled, or managed by a particular religious corporation . . ., or if the curriculum of such school . . . is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

### 1. The religious employer exemption is constitutional.

In the Diocese's prior filed Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings Dismissing Plaintiff's Complaint [Doc. No. 17] ("Diocese's Rule 12 (c) Brief"), the Diocese explained the constitutionality of Title VII's religious employer exemption under an Establishment Clause analysis addressed in Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints v. Amos, 483 U.S. 327; 107 S. Ct. 2862, 97 L. Ed. 2d. 273 (1987) (See Diocese's Rule 12 (c) Brief at pp. 3 – 5). The Court determined in Amos that Title VII's religious employer exemption in 42 U. S. C. § 2000e-1(a) did not violate the Establishment Clause by creating a benefit for a religious employer but served "the legitimate purpose of alleviating significant government interference with the ability of religious organizations to define and carry out their religious mission", which, in the Court's opinion, effectuated "a more complete separation" of church and state. Amos, 483 U.S. at 339.

### 2. The exemptions are necessary to prevent impermissible Constitutional conflict.

The Supreme Court's reasoning in Amos clearly identified the need for the religious employer exception built into Title VII – to more completely separate church and state by alleviating governmental interference with a religious organization's ability to carry out its

5

religious mission. Id. The potential for such interference arises whenever a religious employer's religiously based employment decision is challenged under the guise of civil law. For instance, the mere prospect of such a conflict that could arise in the event of an unfair labor practice charge filed over a religiously based decision caused the Supreme Court to deny the National Labor Relations Board jurisdiction over lay teachers in the Diocese's high schools since:

> [t]he resolution of such charges by the Board, in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy – administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights granted by the Religion Clauses, **but also the very process of inquiry leading to findings and conclusions.**

NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 502 (1979) (emphasis added) (Footnote omitted). The Court concluded that the potential for conflicts under the First Amendment was inevitable if it were to extend the Board's jurisdiction to include lay teachers of church-operated schools that engage in the propagation of faith, stating:

> The church-teacher relationship in a church-operated school differs from the employment relationship in a public or other non-religious school. We see no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that follow.

Id. at 504.

The Diocese respectfully submits that the statutory exemptions come into play in this case to prevent the application of Title VII to an undisputably religiously based decision.

### 3. The decision to not renew Herx's teacher contract was religiously based.

The Diocese has never argued that the express, religious employer exemptions in Title VII completely excuse it from coverage under the non-discrimination provisions of that law. However, it has consistently argued that Herx's claim should be dismissed as a result of those exemptions

since the decision to not renew Herx's teacher contract at the School was religiously based, as described by Msgr. Kuzmich in his deposition taken by Herx's counsel:

> Q.  What was the basis for your decision?
>
> A.  The fact that she had resorted to the practice of in vitro fertilization and – she was culpable.  She clearly knew that she – she did it knowingly and willingly, regardless of what the church taught on it.
>
> Q.  And how do you know that she did it knowingly and willingly?
>
> A.  My discussion[1] with her in that meeting.  It was very clear to me.

(App. at ¶ 50).

Later, when questioned about Diocesan policy that Msgr. Kuzmich felt made it necessary for him to make the decision he made, Msgr. Kuzmich stated:

> . . . I'm referring to the policies of the Diocese that clearly enunciate that the teacher should be a moral exemplar, that the teacher should abide by the teachings of the Catholic church, that the teacher should not engage in any immoral behavior that would disrupt the community or – well, just be considered sinful in nature, that would be scandalous.

App. at ¶ 51).

When asked if he felt he had a choice on following Diocesan policy in his handling the situation with Herx, Msgr. Kuzmich replied:

> I have a conscience[2], try to be a good Catholic priest, abide by the teachings of the church.  I love this school, the children.  I need to protect the children for their sake, for their welfare.  I had to do what I did.

Id.

---

1 Errata sheet – "decision" to "discussion"
2 Errata sheet – "conscious" to "conscience"

Herx testified in her deposition that she did not have any reason to believe that Msgr. Kuzmich's decision was anything other than he felt she had violated Church teachings, including her not showing remorse for having done so. (App. at ¶ 52). There is no dispute that Msgr. Kuzmich's decision was religiously based. There is no evidence to support any reasonable inference that his decision was other than religiously based.

### 4. The non-renewal decision is properly excluded from coverage under Title VII.

The Diocese's Rule 12 (c) Brief contains a review of the legislative history and scope of the religious employer exemptions under Title VII by the Third Circuit in <u>Little v. Wuerl</u>, 929 F. 3d. 944 (3rd Cir. 1991) (<u>See</u> Diocese's Rule 12 (c) Brief at pp. 7 – 10). That case involved a non-Catholic teacher in a Catholic grade school who filed a Title VII Charge for religious discrimination after her employment contract was not renewed due to her remarriage, which was considered to be a rejection of Church doctrine and laws. <u>Little</u>, 929 F.2d at 945-46. Similar to Herx, the contract in <u>Little</u> contained morality based requirements, in part:

> Teacher recognizes the religious nature of the Catholic School and agrees that Employer has the right to dismiss a teacher for serious public immorality, public scandal, a public rejection of the official teachings, doctrine or laws of the Roman Catholic Church, thereby terminating any or all rights that the Teacher may have hereunder, subject, however, to the personal due process rights promulgated by the Roman Catholic Church.

<u>Little</u>, 929 F. 2d at 945.

The court ultimately decided that the religious employer exemptions to Title VII must allow the religious employer the latitude to require that its employees adhere to its religiously based rules, as follows:

> We recognize that Congress intended Title VII to free individual workers from religious prejudice. But we are also persuaded that Congress intended the explicit exemptions to Title VII to enable

religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's "religious activities." Against this background and with sensitivity to the constitutional concerns that would be raised to a contrary interpretation, we read the exemption broadly. We conclude that the permission to employ persons "of a particular religion" includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts. Thus, it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic or non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles. We therefore hold that the exemptions to Title VII cover the Parish's decision not to rehire Little because of her marriage.

Little, 929 F.2d at 951.

The fact that Herx's Complaint alleges discrimination on the basis of sex, rather than religion, is inconsequential. The religious employer exemptions to Title VII go to the basis of the religious employer's decision despite the type of discrimination alleged. To find otherwise would promote the type of constitutionally proscribed inquiries and conclusions which the Supreme Court stated in Catholic Bishop could "impinge on rights granted by the Religion Clauses" (440 U.S. at 502) only if someone files a religious discrimination charge, but allow the infringement if the charge claims discrimination on the basis of race, sex, natural origin, etc. The religious employer's rights granted in the First Amendment cannot be so easily side-stepped, or trampled.

Likewise, the scope of the exemptions has to include the religious employer's ability "to employ only persons whose belief and conduct are consistent with the employer's religious precepts." See Little, 929 F 2d at 951. To find otherwise would mean that a religious employer, such as the Diocese, would be free to discriminate by hiring only Catholics, such as Herx, but then be unable to take religiously based disciplinary steps without fear of judicial scrutiny if the

employee, after being hired, renounces the employer's religious beliefs or engages in conduct contrary to those beliefs, such as Herx did.

Looking at the opening words of Title VII's religious employer exemptions in 42 U. S. C. § 2000 e – 1(a), "This subchapter shall not apply to . . . a religious employer . . . ", the Third Circuit in Little reasoned, "Once Congress stated that '[t]his title [Title VII] shall not apply' to religiously motivated employment decisions by religious organizations, no act by Little [, the Plaintiff,] or the Parish [, the religious employer,] could expand the statute's scope". Little, 929 F. 2d at 951. The Title VII exceptions have to apply to the religious employer's religiously based decisions regardless of the nature of the discrimination charge filed under "the subchapter" or the results are illogical. Because it is undisputed that the decision to not renew Herx's contract was religiously based, no further inquiry should be permitted. Herx's Title VII claim should be dismissed.

## B. The ADA Defenses

Similar to Title VII, the wording of the ADA provides two (2) express defenses for "Religious entities," as follows:

> 1) **In general.** This title shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

> 2) **Religious tenets requirement.** Under this title, a religious organization may require that all applicants and employees conform to the religious tenets of such organization.

42 U.S.C. § 12113 (d)(1) and (d)(2).

The Diocese contends that the same legal analysis supporting the need for the religious employer exemptions built into Title VII applies to the Religious entities' defenses under the ADA. Once it is evident that a religious entity's decision was religiously based, the claim of disability

10

discrimination related to that decision under the ADA should fail. To inquire into, evaluate, or weigh the merits of the decision would run afoul of the Religion Clauses of the First Amendment. See Chicago Bishop, 440 U.S. at 502.

Moreover, the Church's teachings on IVF are not something new or secret, which could be considered a ruse for otherwise illegal discrimination. Certainly those teachings long pre-dated Msgr. Kuzmich's meeting with Herx on April 14, 2011, since the Congregation for the Doctrine of the Faith document to which he referred and read in his meeting with Herx that day to explain the Church's teachings on IVF was published February 22, 1987. (App. at ¶ 41). Moreover, Father Mark Gurtner, J.C.L., gave a presentation at the Parish, of which Herx was a member, on February 25, 2008, which identified Church teachings on IVF. (App. at ¶ 58). Herx admittedly received copies of Today's Catholic in which articles were published relative to Church teachings on IVF and to Church-approved fertility treatments. (App. at ¶¶ 55, 56, 57).

The Seventh Circuit recently addressed the religious employer exemptions/defenses built into Title VII and the ADA in Korte v. Sebelius, 735 F.3d 654 (7th Cir. 2013). The focus of that case was the ability of a for-profit company to fit within the scope of the Religious Freedom Restoration Act ("RFRA"). Korte, 735 F. 3d at 678-79. In the course of that decision, the Court identified religiously based exemptions/defenses unique to religious employers, stating:

> Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of religion. See 42 U.S.C. § 2000e-2. Certain religious employers are exempt from this part of Title VII and may take religion into account in making employment decisions: "This subchapter shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion . . .." Id. § 2000e-1(a). The ADA, which prohibits employment discrimination on the basis of disability, contains a similar exemption for religious employers. See Id. § 12113(d)(1)-(2).

Korte, 735 F.3d at 675.

The court noted the need for those exemptions stating that "[i]t's well understood that the **Free Exercise Clause** protects 'first and foremost, the right to believe and profess,' but also the right to engage in religiously motivated conduct." Korte, 735 F. 3d at 676, citing Employment Div. Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 877 (1990). The concept of religious liberty extends beyond the rights of individuals and also "protects, broadly speaking, the autonomy of the church." Korte, 735 F. 3d at 677. The Religion Clauses of the Constitution give churches, not civil authorities, the right of control over religious governance, and give ecclesiastical authorities, not judges, authority to decide questions within their religious domain. Id. at 678. Pertinent to the issue at hand, the Court stated:

> The religious-employer exemptions in Title VII and the ADA are legislative applications of the church-autonomy doctrine. By their terms the exemptions are limited to religiously affiliated employers, a limitation that makes sense in light of the rationale for the rule. **The exemption is categorical, not contingent; there is no balancing of competing interests, public or private. In other words, where it applies, the church-autonomy principle operates as a complete immunity, or very nearly so.**

Id. (emphasis added)

Properly applied, as stated by the Court in Korte and as noted by the Third Circuit in Little, *supra*, the statutory exemptions in Title VII and the ADA act to preserve and protect the Diocese's freedom to exercise its constitutionally protected right to make religiously based employment decisions without governmental interference. Herx's Title VII and ADA claims should be dismissed based on these statutory exemptions.

### C. Title VII and the ADA are unconstitutional, as applied, if Herx's claims are allowed to proceed.

The lawfulness of the religious employer exemption in Title VII was decided in Amos, 483

U.S. at 339 (exemption "rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to carry on their religious missions"). The need for a buffer between statutory laws and constitutionally based rights under the Religion Clauses was expressed in <u>Catholic Bishop of Chicago</u>, 440 U.S. at 490 (the process of inquiring into the good faith decisions of a Catholic school's clergy-administrator impinges on rights granted by the Religious Clauses). Moreover, it is beyond dispute that, "the **Free Exercise Clause** protects not just belief and profession but also religiously motivated conduct; and . . . individuals and organizations – whether incorporated or not – can exercise religion", and "that nonprofit religious corporations exercise religion in the sense that their activities are religiously motivated". <u>Korte</u>, 735 F. 3d at 679.

How the religious corporation chooses to exercise its religious activity is protected since "the First Amendment does not permit federal courts to dictate to religious institutions how to carry out their religious missions or how to enforce their religion practices." <u>Hall v. Baptist Memorial Health Care Corp. d/b/a Baptist Memorial College of Health Services</u>, 215 F. 3d 618, 626 (6th Cir. 2000) (in Title VII action court cannot compare "weight" of moral wrongs in terms of proffered comparator evidence). "A secular court may not take sides on issues of religious doctrine." <u>McCarthy v. Langsenkamp Family Apostolate</u>, 714 F. 3d 971, 975 (7th Cir. 2013) (citations omitted).

The religious employer exemptions in Title VII and the ADA allow the Diocese, as a religious employer, to "take religion into account in making employment decisions." <u>Korte</u>, 735 F. 3d at 675. The exemptions go to the religious employer based upon the nature of the decision made, *i.e.* whether it was religiously based. It would be nonsensical to claim that the exemptions are dependent on the nature of the claim made against the religious employer. To deny the Diocese

those exemptions for the religiously based employment decision at issue would generate the type of constitutionally prohibited inquiry into religious matters and values that the exemptions were designed to prevent. Such inquiry would be in violation of the Religion Clauses, thereby rendering both Title VII and the ADA unconstitutional, as sought to be applied by Herx in this case.

## D. Herx's Claims Are Barred By the Ministerial Exception

### 1. The Ministerial Exception

The "ministerial exception" serves as a Constitutionally imposed bar to a "minister's" employment discrimination claim against a religious employer regardless of whether the adverse employment action at issue was religiously based. Hosanna – Tabor Evangelical Lutheran Church and School v. EEOC, 132 S. Ct. 694, 709 (2012). The Seventh Circuit recognized this exception prior to Hosanna - Tabor based upon a "function of the position" analysis. Alicea-Hernandez v. The Catholic Bishop of Chicago, 320 F. 3d. 698, 703 (7th Cir. 2003) (Hispanic Communications Manager position qualifies as ministerial since it involves conveyance of the Church's message). See also Tomic v. Catholic Diocese of Peoria, 442 F. 3d 1036 (7th Cir. 2006) (music director's duties had significant religious dimension and, therefore, he was unable to pursue age discrimination claim). The need for this additional defense, based on the employee's status, is clear:

> The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful

also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

Hosanna – Tabor, 132 S. Ct. at 706.

The determination of who qualifies as a minister is not the result of a rigid formula but requires a review of all the circumstances of employment. Id. at 707. Pertinent factors may include, among others, the employee's title, religious training or degree(s), education, job duties relative to the employer's religious mission and how the employee views his or her ministerial function. See Hosanna – Tabor, 132 S. Ct. at 707-08. The fact that the employee performs secular as well as religious duties and the amount of time spent on secular duties are relevant in assessing status, but must be considered with regard for religious functions performed. Id. at 708-09.

### 2. The Diocese's Religious Expectations and Requirements for Teachers

Consistent with Bishop Rhoades' personal beliefs and the canonically imposed obligation for him to make a Catholic-based education available to the faithful in the Diocese, the Diocese has set religious standards for teachers in Diocesan schools, favoring Catholics, as follows:

> Since the distinctive and unique purpose of the Catholic school is to create a Christian education community, enlivened by a shared faith among the administrator(s), teachers, students and parents, the highest priority is to hire Catholics in good standing in the Catholic Church who demonstrate a commitment to Christian living, are endowed with and espouse a Catholic philosophy of life, and believe in the Catholic Church and her teachings.

(App. at ¶¶ 3, 9).

Herx was employed at the School as a Language Arts teacher. That teaching function was incorporated into the School's mission "to enable all the students to live their Catholic faith and to achieve academic success." (App. at ¶ 14). The Diocese requires that all teachers help fulfill its religious mission at the School by serving as moral exemplars, modeling and teaching

Catholic doctrine, values and morals, working cooperatively to form a faith community in the School and Parish, and committing to ongoing faith formation and professional growth. (App. at ¶ 10). The importance of the religious functions served by the School's teachers, such as Herx, cannot be over emphasized.

Daily prayer and weekly Mass attendance with students as well as participation in family rosary, All Schools Mass, Eucharistic Adoration, reconciliation, May Crowning and other prayer services/events with students are critical components of the School's religious mission served by Diocesan teachers. (App. at ¶¶ 15, 24, 26). "Regular" teachers, such as Herx, provided the routine point of contact for students in the Catholic school to witness and live religious truth and values. (App. at ¶¶ 15, 25). Msgr. Kuzmich called on the teachers at the School to be witnesses to Christ and considered the teachers' participation in religious functions with their students and their open expression of their relationships with God in the classroom to be necessary components of the teachers' obligation to develop the student's values and faith formation. (App. at ¶ 25).

The Diocese encourages a teacher's faith formation and growth by requiring all teachers to attend annual Institute of Catechetical Formation ("ICF") days. (App. at ¶ 13). Herx recalled attending an ICF day session, selected by her, titled "What Jesus Has To Say To Teenagers Today", which was intended "to help those in teen ministry reflect on the question: Where are teens really coming from? What do teens really need? What does Jesus want to do in their lives?" Id.

### 3. Herx understood and promoted her religious function as a teacher at the School.

Herx identified her membership in and dedication to the Catholic Church when applying for a teaching position at the School as an attribute to help her get a job. (App. at ¶¶ 18, 19). She knew that she needed to be a Catholic role model as a teacher. Id. (App. at ¶ 20). On her application Herx stated, "A Catholic School will support and encourage its students to live out

16

their faith and spirituality. It will teach students the importance of a quality Christ based education." (App. at ¶ 23). Throughout her employment as a teacher at the School, Herx knew that the School and the parents of the students she taught expected her to guide students to a stronger faith, and to help students grow academically and spiritually. (App. at ¶¶ 21, 22). She performed those functions, not only by attendance and participation at religious events, but by daily prayer and teaching her students the importance of Christ based education through reference to Jesus and the Ten Commandments and sharing her devotion to God with her students when she had the opportunity. (App. at ¶¶ 23, 24, 25). Consistent with the Diocese's expectations, Herx performed religious functions by expressing genuine concern for her students' spiritual development, such as by notifying Msgr. Kuzmich of a student who expressed spiritual difficulties. (App. at ¶ 25).

### 4. Herx qualified as a "minister"

The Diocese, the School and, very importantly as admitted by Herx, the parents of the students Herx taught at the School, expected and relied upon Herx to perform a ministry function with her students every day while teaching at the School. As Herx stated, the School provided her with an environment where teachers "are encouraged to promote [their] faith and give children a quality education while practicing God's Word." (App. at ¶ 33).

Herx was not employed as a "religion teacher", but she admits to serving the important function of living her faith as an example for her students on how to live their faith, guiding her students to a stronger faith, encouraging their spiritual development and sharing her devotion to God whenever the opportunity presented itself. Similar to the press secretary plaintiff in Alicea-Hernandez, whose function was determined to be ministerial because as a liaison she helped shape the message sent to the Church's Hispanic Community (Alicea-Hernandez, 320 F.3d at 704), Herx

was entrusted with the obligation to nurture the faith and spiritual development of the School's students on a daily basis. Those functions, seemingly routine in nature, go to the heart of what makes the School a Catholic school and show Herx's qualification as a minister subject to the ministerial exception.

### E. Herx's Title VII Claims Are Meritless

#### 1. The Legal Standard

Recent Seventh Circuit case law indicates that for a plaintiff to succeed in a Title VII lawsuit, the plaintiff must show:

> he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action . . ., and that the employer took this adverse action on account of the plaintiff's membership in the protected class.

Morgan v. SVT, LLC, 724 F.3d 990, 995 (7th Cir. 2013); See Coleman v. Donahoe, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring). To survive a defendant's motion for summary judgment, the plaintiff must identify whether he is utilizing "'a direct' or 'indirect' method of proof (or both)" and then must show either direct discriminatory intent and sufficient circumstantial evidence which together permit the inference that discrimination motivated the adverse employment action, or sufficient circumstantial evidence alone to permit such an inference. Morgan, 724 F.3d 995. "The central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.)", regardless of whether the plaintiff follows the McDonnell Douglas burden shifting approach. Id. at 997.

#### 2. On Herx's Sex Discrimination claims, there is no evidence to show that the Diocese treated Herx differently than similarly situated male employees in the terms and conditions of her employment.

With respect to her sex discrimination claims, Herx claims to have been treated differently than similarly situated males. (App. ¶ 61). To be considered "similarly situated", a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards', (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them'." Coleman v. Donahoe, 667 F. 3d 835, 846 – 47 (7th Cir. 2012), citing Srail v. Village of Lisle, 588 F. 3d 940, 945 (7th Cir. 2009.

"To be 'similarly situated', a plaintiff must show that another employee is 'directly comparable to her in all material respects'." Eiter v. Three Rivers Federal Credit Union, 2006 U.S. Dist. LEXIS 86147, *16 (N.D.Ind. November 27, 2006), citing Burks v. Wisconsin Dep't. of Transp., 464 F. 3d 744, 751 (7th Cir. 2006). "A similarly situated employee must have been disciplined, or not, by the same decision maker who imposed an adverse employment action on the plaintiff." Thomas, v. S.B.C.S. Board of School Trustees, 2008 U.S. Dist. LEXIS 31197, *38 (N.D. Ind. April 15, 2008), quoting Little v. Ill. Dept. of Rev., 369 F. 3d 1007, 1012 (7th Cir. 2004), citing Patterson v. Indianapolis Publ. Sch. Bd., 276 F. 3d 334, 338 (7th Cir. 2002); Radue v. Kimberly-Clark Corp., 219 F. 3d 612, 617-18 (7th Cir. 2000). See also Morgan, 724 F. 3d at 997-98 (managerial employee subject to different supervisor regarding different, less serious infraction not similarly situated). For purposes of the similarly situated employee analysis, the "decision maker is the person responsible for the contested decision." Schandelmeier - Bartels v. Chicago Park Dist., 634 F. 3d. 372, 379 (7th Cir. 2011), quoting Rogers v. City of Chicago, 320 F. 3d. 748, 754 (7th Cir. 2003).

When asked in her deposition who she claimed was treated better than her, Herx responded that three (3) male employees of the School who went to a strip club were not fired, and that

showed discrimination against her as a female who engaged in IVF and had her teaching contract not renewed. (App. at ¶ 61). Even assuming that any of those male employees was signatory to a Diocesan Regular Teacher Contract with the same morals clause as in Herx's contract, this comparison fails. The Church teaches that IVF is morally wrong, an intrinsic evil which no circumstances can justify. (App. at ¶¶ 39, 54). Msgr. Kuzmich considered in vitro fertilization gravely immoral, and violative of the Fifth Commandment, Thou Shalt Not Kill. (App. at ¶ 40).

Most Reverend Kevin C. Rhoades ("Bishop Rhoades"), the Diocese's Chief Catechist, considers IVF "graver" than going to a strip club since "[t]he former is a sin against the dignity of human embryos and the rights of children" while "[t]he latter can be a sin against chastity, depending upon intention and circumstances." (App. at ¶ 63). Msgr. Kuzmich considered the three (3) School employees who had gone to the strip club to have engaged in inappropriate conduct that was imprudent, but he did not think the conduct warranted termination or nonrenewal because of its gravity and the fact that he understood the employees were remorseful. (App. at ¶ 62). Msgr. Kuzmich testified that he did not detect any remorse or sorrow on Herx's part for engaging in IVF. (App. at ¶ 50). In fact, Herx admittedly continued IVF treatments after Msgr. Kuzmich met with her to explain Church Teachings and with knowledge that continuing the treatment could cost her her job at the School. (App. at ¶¶ 42, 43, 44).

While Herx and the three (3) male employees may have had the same supervisor, Msgr. Kuzmich, and been subject to the same "morals clause" standard, the comparison fails on the third prong of the similarly situated analysis regarding similarity of conduct without differentiating or mitigating circumstances. Church teachings note a difference between the gravity of IVF, "a sin against the dignity of human embryos and the rights of children", as opposed to going to a strip club, which "may be a sin against chastity, depending on evidence and circumstances." (App. at

¶ 63). Msgr. Kuzmich considered IVF gravely immoral, akin to murder, and a violation of the Fifth Commandment, while going to a strip club imprudent. (App. at ¶¶ 40, 62). Further, sorrow is a factor to be considered pursuant to the Church teaching on repentance. (App. at ¶ 50). While Msgr. Kuzmich understood that the three (3) male employees were remorseful for their conduct, he did not detect any remorse or sorrow on Herx's part for engaging in IVF. Id.

On its face, the comparison of the male employees' conduct does not equate with Herx's conduct. As a matter of moral judgment, and the law, the Court should accept the analysis and conclusion based on Church teaching as provided by Msgr. Kuzmich and Bishop Rhoades.

> The federal courts are not in the business of enforcing orthodoxy or requiring consistency and uniformity in religious beliefs or practices. If a particular religious community wishes to differentiate between the severities of two tenets of its faith, it is not the province of the federal courts to say that such differentiation is discriminatory and therefore warrants Title VII liability . . ..

Hall v. Baptist Memorial, 215 F. 3d at 626 (citation omitted). "A secular court may not take sides on issues of religious doctrine". McCarthy, 714 F. 3d at 975. Herx cannot create a comparator based upon assessment of equivalency of moral wrongs.

### 3. With respect to her Pregnancy Discrimination claim, there is no evidence to show that Herx was treated less favorably than male employees after becoming aware that Herx was trying to become pregnant.

Herx claims that she was discriminated against in that she was treated less favorably than similarly situated male employees after the Diocese became aware she was trying to become pregnant. (App. at ¶ 60). Not only is there no evidence to support this claim, it stands in stark contrast to the evidence of record.

It defies common knowledge, logic and common sense to suggest that the Catholic Church opposes married couples having children. In her own words, Herx testified that she had been

taught, "That when you marry in the church, that you need to procreate." (App. at ¶ 65). Msgr. Kuzmich testified, "Many teachers [at the School] are pregnant – we support children. It's a beautiful thing for the class of students to see a pregnant teacher. A teachable moment." (Id. at ¶ 67). Moreover, the Diocese's Family Medical Leave Act policy, P3340, in place during Herx's employment at the School offered twelve months of leave following the birth of the child, rather than the legally required twelve weeks. (Id. at ¶ 12).

Herx's employment history at the School also proves Herx's claim of pregnancy discrimination to be false. In her second year of employment at the School, Herx requested from Guffey and received, without difficulty, a long-term leave of absence, from November 29, 2004 to March 21, 2005, to care for her son who was born prematurely in November 2004. (App. at ¶ 29). Herx voluntarily resigned her employment at the School at the end of the 2006-2007 school year stating she "would like to focus more on parenting and being there for my family." (Id. at ¶ 31). Rather than simply be done with her for having been pregnant, giving birth to her child, taking extended leave after the birth of her child, and then resigning to be there for her family, Guffey rehired Herx to teach at the School for the 2008-2009 school year. (Id. at ¶ 34).

The following year, in November 2009, Herx suffered a miscarriage and spent four (4) days in the hospital where Msgr. Kuzmich visited her and prayed with her. (App. at ¶¶ 35, 36). According to Herx, Msgr. Kuzmich was supportive of her and her husband having another child. (Id. at ¶ 35). Despite that pregnancy and time off taken, Herx was offered a contract for the next school year. (Id. at ¶ 37).

There is no evidence which provides any inference of discrimination against Herx for trying to become pregnant or being pregnant. (App. at ¶65). The issue relative to the nonrenewal of Herx's Regular Teacher Contract is, and has always been, Herx's engagement in IVF treatment

and Msgr. Kuzmich's religiously based decision to not renew Herx's contract as a result. Therefore, her claim for pregnancy discrimination fails.

### 4. Likewise, there is no evidence that the Diocese discriminated against Herx because she was unable to get pregnant by natural means and sought treatment for infertility.

Church teachings recognize the suffering of a sterile couple and the Church approves of fertility treatments which maintain the natural acts required for procreation. (App. at ¶ 64). Regardless of whether Herx could become pregnant by natural means, and regardless of whether it was prescribed by her physician, the Church teaches that in vitro fertilization is wrong, an intrinsic evil. (Id. at ¶ 39). The issue is not pregnancy and not infertility treatments in general. The issue is IVF, a procedure that the Church finds immoral.

### 5. Any other claim by Herx regarding male teachers "similarly situated" to her who Herx believes were treated better than her also fail.

Herx's efforts to find a similarly situated male employee at the School who was treated more favorably than her have been fruitless. There is no evidence to support any knowledge on the part of Guffey or Msgr. Kuzmich of such an individual, even if he existed.

Moreover, even if such a person existed, since Msgr. Kuzmich's non-renewal decision was religiously based, Herx would be unable to show the person to be "similarly situated" to her due to the religious assessment that would need to be conducted, which would be inappropriate. That assessment of conduct requires moral analysis since "the gravity of sin is more or less great", the morality of human acts cannot be assessed "by considering only the intention that inspires them or the circumstances and intention", and true repentance, sorrow and remorse, must be considered. (App. at ¶¶ 50, 63).

For all these reasons, Herx's claims of sex discrimination should be dismissed.

### 6. Herx's Claim Of Disability Discrimination Under The ADA Is Meritless

Using the same legal standard for showing discrimination under Title VII, supra, Herx's claim of discrimination under the ADA also fails.

### 1. Herx's disability status is immaterial.

Whether Herx suffers from a medically diagnosed fertility problem that qualifies as a disability under the ADA is a non-factor relative to the Diocese's treatment of Herx in this case. Guffey and Msgr. Kuzmich were both aware as early as November 2009 that Herx claimed to be having fertility issues. (App. at ¶¶ 35, 36). Still, Herx was given a contract for the next school year. (Id. at ¶ 37). No one, including Herx, has ever claimed that the Diocese took disciplinary or other adverse action against Herx relative to her difficulty to have a child or her time taken off for medical reasons prior to April 2011 when Msgr. Kuzmich became aware that Herx was undergoing in vitro fertilization treatments.

### 2. Herx has no evidence that the decision to not renew her teacher contract was for anything other than Msgr. Kuzmich felt she had violated Church teachings.

Herx has no evidence that any employee at the School, similarly situated to her, was treated more favorably than her, disabled or not. More important, Herx stated that she has no reason to believe that Msgr. Kuzmich's decision regarding the non-renewal of her contract was based upon anything other than that she violated Church teachings by engaging in IVF and showed no remorse for having done so. (App. at ¶ 52). That, in fact, was the basis for Msgr. Kuzmich's decision along with the stated need to hold teachers to the moral exemplar standard and prevent the occurrence of scandal. (Id. at ¶¶ 50, 51). Church teachings on IVF would apply regardless of any disability on Herx's part. (Id. at ¶¶ 39, 54).

There is no direct or circumstantial evidence which supports any inference that Herx's alleged "disability" played any part in the decision to not renew her teacher contract at the School. As a result, Herx's claim under the ADA should be dismissed.

## **CONCLUSION**

Defendants respectfully submit they are entitled to judgment as a matter of law for five (5) separate reasons, each one of which is sufficient to warrant dismissal by way of summary judgment. The express exemptions for religious employers in Title VII and the ADA preclude Herx's claims, since it is undisputed the decision to not renew Herx's contract was religiously based. To hold otherwise would result in Title VII and the ADA being unconstitutional as applied. Herx's claims should also be dismissed based on the "ministerial exemption" as she has admitted and it is undisputed her job duties at the School qualified her as a "minister". Finally the undisputed facts show that Herx's sex, pregnancy, or disability were not factors in the decision to not renew her contract.

Because the decision to not renew Herx's contract is undisputably religiously based, Defendants respectfully submit that they are entitled to summary judgment as a matter of law.

Respectfully submitted,

HALL & GOODEN LLP

 s/ Scott Hall
Scott Hall, #12060-49
810 South Calhoun Street, Suite 100
Fort Wayne, IN 46802
Telephone: (260) 422-2035
Fax: (260) 424-2541
Attorney for Defendants

THEISEN & ASSOCIATES, LLC

 s/ John C. Theisen
John C. Theisen, #549-02
810 South Calhoun Street, Suite 200
Fort Wayne, IN 46802
Telephone: (260) 422-4255
Facsimile: (260) 422-4245
Attorney for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document

was served electronically and by First Class U. S. Mail postage prepaid on the 25th of April, 2014

to the following:

Kathleen A. DeLaney, Esq.
Christopher Stake, Esq.
DeLaney & DeLaney LLC
3646 North Washington Blvd
Indianapolis, IN 46205

 s/ Scott Hall
Scott Hall