UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

EMILY HERX,                          )
                                     )
              Plaintiff              )
                                     )
         vs.                         )      CAUSE NO. 1:12-CV-122 RLM
                                     )
DIOCESE OF FORT WAYNE-               )
SOUTH BEND INC. and ST.              )
VINCENT DE PAUL SCHOOL,              )
                                     )
              Defendants             )


## OPINION AND ORDER

The Diocese of Fort Wayne-South Bend, Inc. and St. Vincent De Paul School declined to renew Emily Herx's teaching contract after learning that she was undergoing in vitro fertilization in an effort to become pregnant. The Diocese and the School claim they declined to renew her contract because the Catholic Church views in vitro fertilization as gravely immoral. Mrs. Herx sued the Diocese and the School, claiming the nonrenewal — effectively a termination — was based on her sex and her disability (infertility), and the Diocese and the School moved for summary judgment based on their rights as religious organizations and the religious reason for the employment decision. The court denies the summary judgment motion on the sex discrimination claim because, while a jury could find that a gender-neutral rule against in vitro fertilization prompted her nonrenewal, a jury also could find that a male teacher's contract would have been renewed under the same circumstances. The court grants summary judgment on the

disability claim because no reasonable jury could find that Mrs. Herx lost her teaching position because of her infertility, as opposed to the treatment for her infertility.

## I. Facts

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is enough evidence for the nonmoving party for a jury to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In deciding whether a genuine issue of material fact exists, the court accepts as true the evidence favoring the nonmovant, and draws all inferences that a reasonable jury could draw in her favor. Anderson v. Liberty Lobby, 477 U.S. at 255; Weigle v. SPX Corp., 729 F.3d 724, 730 (7th Cir. 2013). The existence of an alleged factual dispute, by itself, won't defeat a summary judgment motion; the nonmovant must present definite and competent evidence at the summary judgment stage, Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and affirmatively show that there is a genuine issue of material fact that needs to be resolved at trial. Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); see also FED. R. CIV. P. 56(e)(2). Summary judgment has become "the put up or shut up moment" when

a party must show evidence that would convince a jury to accept its version of the facts. Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007)*(quoting* Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005)).

These are facts a reasonable jury could find, based on the summary judgment record:

The Diocese hired Mrs. Herx in August 2003 to teach junior high language arts at St. Vincent School in Fort Wayne, Indiana, and she served in that capacity on and off until her termination in June 2011. During her tenure, Mrs. Herx's employment was governed by year-to-year teacher's contracts that contained the following provision:

> TERMS AND CONDITIONS: This contract may be terminated prior to its expiration, or not renewed, for reasons relating to improprieties regarding Church teachings or laws, unsatisfactory performance, inattention to duties, incompetency, irregular attendance, insubordination, failure to follow diocesan policies and procedures, or for any other justifiable reason, provided that, if the contract is terminated or not renewed, the teacher shall have, as the teacher's sole means of recourse, an opportunity to be heard in accordance with appropriate Diocesan Educational Policies. An employee will not be discharged on account of disability if able to perform, with or without reasonable accommodations, the essential functions of the teaching position. **Acknowledging and accepting the religious and moral nature of the Church's teaching mission, the undersigned agrees to conduct herself or himself at all times, professionally and personally, in accordance with the episcopal teaching authority, law and governance of the Church in this Diocese. Charges of immoral behavior, or of conduct violative of the Teachings of the Church shall ultimately be resolved exclusively**

**by the Bishop, or his designee, as provided in the Diocesan Educational Policies.**

(emphasis added to highlight the portion of the contract the parties agree to be the "morals clause"). Also in effect during Mrs. Herx's tenure was Diocesan Educational Policy No. P3020, which reads in pertinent part as follows:

II. Religious Standards

Since the distinctive and unique purpose of the Catholic school is to create a Christian educational community, enlivened by a shared faith among the administrator(s), teachers, students and parents, the highest priority is to hire Catholics in good standing in the Catholic Church who demonstrate a commitment to Christian living, are endowed with and espouse a Catholic philosophy of life, and believe in the Catholic Church and her teachings. Both Catholic and non-Catholic teachers who are employed in a Catholic school must, as a condition of employment, have a knowledge of and respect for the Catholic faith, abide by the tenets of the Catholic Church as they apply to that person, exhibit a commitment to the ideals of Christian living, and be supportive of the Catholic faith.

Sometime in 2008, Mrs. Herx and her husband learned that she suffered from a medical condition that causes infertility. The couple sought the advice of a specialist and began a course of fertility treatments that included artificial insemination and in vitro fertilization. Before undergoing any treatments, Mrs. Herx told her immediate supervisor, St. Vincent School Principal Sandra Guffey, that she was scheduled to undergo artificial insemination, to which Ms. Guffey appeared to respond favorably. When that procedure wasn't successful, Mrs. Herx began her first round of in vitro fertilization treatments in March 2010 after

having notified Ms. Guffey that she would be taking time off from school. Ms. Guffey didn't object,[1] and Mrs. Herx was allowed to take sick days to undergo her treatments. The Diocese's health insurance plan, of which Mrs. Herx was a member, covered some of the associated medical bills. At around the same time, Mrs. Herx renewed her teaching contract with St. Vincent School for the 2010-2011 school year.

Mrs. Herx learned about a year later — sometime in April 2011, when she was about to undergo a second round of in vitro fertilization treatments — that her infertility treatments were problematic for the Diocese (from this point on, the Diocese and the School are simply referred to as "the Diocese"). She learned at a meeting with Monsignor John Kuzmich of St. Vincent de Paul Catholic Church that Ms. Guffey had told him about her infertility treatments. Msgr. Kuzmich told her that in vitro fertilization treatments violated Church teachings, a fact of which Mrs. Herx was unaware, and he said that she would have been better off had she not mentioned the treatments to anyone. Mrs. Herx asked if her job was at risk and Msgr. Kuzmich told her he wasn't sure. The Diocese notified Mrs. Herx that her teaching contract wouldn't be renewed for the 2011-2012 school year based on what the Diocese termed "improprieties related to church teachings or law."

---

[1] When Mrs. Herx told Ms. Guffey about her in vitro fertilization procedure, Ms. Guffey responded as follows: "Thank you for sharing this with me. I appreciate how difficult it was for you to come to this decision. I will continue to pray for you and your husband. Keep me up to date. Take care and God bless, Sandra."

Mrs. Herx met with school officials to discuss reconsideration of the termination decision, and was informed that the decision to not renew her contract would stand. A few weeks later, Mrs. Herx met with Msgr. Kuzmich to appeal the termination decision, but Msgr. Kuzmich decided that her contract wouldn't be renewed. Mrs. Herx was allowed to continue teaching through the end of the 2010-2011 school year. Her employment was ultimately terminated on June 22, 2011.

Mrs. Herx filed a charge of discrimination with the Equal Employment Opportunity Commission. The EEOC issued its Determination concluding that the the Diocese had terminated Mrs. Herx's employment in violation of Title VII and the Americans with Disabilities Act.

Mrs. Herx filed her complaint in this court in a timely manner, alleging that the Diocese violated Title VII of the Civil Rights Act of 1964, as amended, including the Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq.*, and Title I of the Americans with Disabilities Act, 42 U.S.C. § 120101 *et seq.* The court denied the Diocese's motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) after a hearing in March 2013, and the case is now before the court on the Diocese's motion for summary judgment.

## II. Discussion

### A. Title VII and the Pregnancy Discrimination Act

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any individual because of her sex. 42 U.S.C. § 2000e-2(a). The Pregnancy Discrimination Act extended the "because of sex" protections of Title VII to include pregnancy, childbirth, and related medical conditions. 42 U.S.C. § 2000e(k); *see also* Newport News Shipbuilding and Dry Dock Co. v. EEOC, 462 U.S. 669, 684 (1983) ("The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."); Griffin v. Sisters of Saint Francis, Inc., 489 F.3d 838, 843 (7th Cir. 2007) ("[P]regnancy is a proxy for gender, and, therefore, discrimination against pregnancy is discrimination against women"). Mrs. Herx's claim for pregnancy discrimination "is a claim for gender discrimination, and the legal analysis for both claims is the same." Serednyj v. Beverly Healthcare, LLC, 656 F.3d 540, 547 (7th Cir. 2011). For purposes of this discussion, the court refers to the two statutes collectively as Title VII.

A Title VII plaintiff can prove her claim in either of two ways: by presenting direct evidence of discriminatory intent by the defendant or by employing the burden-shifting framework established in McDonnell Douglass Corp. v. Green, 411 U.S. 792 (1973). Under the indirect method of proof, a plaintiff must establish that (1) she's a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and

(4) similarly situated employees outside the protected class were treated more favorably. <u>Keeton v. Morningstar, Inc.</u>, 667 F.3d 877, 884 (7th Cir. 2012); *see also* <u>Hall v. Nalco Co.</u>, 534 F.3d 644, 648-649 (7th Cir. 2008) ("adverse employment action based on childbearing capacity will always result in treatment of a person in a manner which but for that person's sex would be different").

The Diocese maintains summary judgment is proper on Mrs. Herx's Title VII claims because as religious organizations, they are exempt from liability under Title VII. They argue in the alternative that Mrs. Herx can't succeed under the direct method of proof because she has no evidence of discriminatory intent; according to the Diocese, neither Mrs. Herx's gender nor her disability were factors in the decision to not renew her contract. Lastly, the Diocese says that while Mrs. Herx can establish the first three elements of a prima facie case – she's a member of a protected class, she was meeting her employer's legitimate job expectations, and she was effectively terminated from her teaching position through the non-renewal of her contract – her claim fails under the fourth element because no similarly situated employees were treated more favorably.


## 1. Title VII Exemptions

Title VII contains two separate provisions that combine to exempt religious entities and educational organizations from its nondiscrimination mandate in certain circumstances. The first exemption provides that Title VII

> shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). The second exemption, specific to religious educational organizations, provides that

> it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

The Diocese says courts have construed those exemptions broadly to protect employment actions taken by religious institutions against both the religious and secular activities of their employees. The Diocese points to the decisions in Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327 (1987), and National Labor Relations Board v. Catholic Bishop of Chicago, 440 U.S. 490 (1979), as confirming the need for Title VII's religious employer exemptions to alleviate governmental interference with a religious organization's ability to carry out its religious mission. The Diocese also relies on Little v. Wuerl, 929 F.2d 944, 951 (3d Cir. 1991), in which the plaintiff

brought suit for religious discrimination under Title VII against the Catholic school where she had taught for many years. The parties stipulated that Ms. Little's contract wasn't renewed because she had remarried without taking the steps necessary to get the Roman Catholic Church's validation of her second marriage. The Parish based its action on the "Just Cause Termination" section of the teachers' handbook, which required the dismissal of a teacher for public rejection of the Church's official teachings, which would include a teacher's entry into a marriage which is not recognized by the Church. 929 F.2d at 946. The <u>Little</u> court recognized that while "Congress intended Title VII to free individual workers from religious prejudice . . . Congress [also] intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'" 929 F.2d at 951. The court interpreted the phrase "of a particular religion" in Title VII's exemption provisions as including "permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts," and concluded that Title VII's prohibition against religious discrimination isn't violated when a parochial school discharges a teacher who publicly engaged in what the school regarded as inconsistent with its religious principles. 929 F.2d at 951.

The Diocese explains that, like the parish in <u>Little</u>, it operates its Catholic schools based upon the Church's principles, with teachers who reflect correct doctrine and integrity of life, so that schools providing a Catholic education with

the Christian spirit are available to members of the Diocese. The Diocese says that its religious standards direct that its teachers fulfill the Church's teaching mission as directed by the bishop, including instructing, supervising, and providing a moral example for students. The Diocese concludes that the religious employer exemptions in Title VII apply, and no further inquiry should be allowed, because its decision to not renew Mrs. Herx's contract was religiously based.

The court doesn't read the case law the same way the Diocese does. Title VII doesn't give religious organizations freedom to make discriminatory decisions on the basis of race, sex, or national origin. Petruska v. Gannon Univ., 462 F.3d 294, 303 (3d Cir. 2006) (quoting Rayburn v. General Conf. of Seventh-Day Adventists, 772 F.2d 1164, 1166 (4th Cir. 1985)). Title VII's exemptions are limited specifically to claims of discrimination premised upon religious preferences, and Mrs. Herx isn't complaining about religious preference. The Rayburn court summarized the history of Congressional action relating to Title VII:

> The legislative history reinforces the plain meaning of the statutory text. The original Act passed by the House in 1964 excluded religious employers from coverage altogether. The final version excluded such employers only with respect to discrimination based on religion, and then only with respect to persons hired to carry out the employer's "religious activities." In 1972 the statute was amended to delete the word "religious," but Congress specifically rejected proposals to broaden further the scope of the exemption. To the contrary, the analysis pertaining to § 702 states clearly that "[s]uch organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin."

Rayburn v. General Conf., 772 F.2d at 1167 (*quoting* Section-by-Section Analysis of J.R. 1946, the Equal Employment Opportunity Act of 1972, reprinted in *id.* at 1844, 1845) (internal citations omitted).

Consistent with Rayburn v. General Conf., courts across the country have found Title VII to apply to claims against religious employers for discrimination based on race, sex, and national origin. *See, e.g.,* Kennedy v. St. Joseph's Ministries, Inc., 657 F.3d 189, 192 (4th Cir. 2011) ("Section 2000e-1(a) does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin."); Boyd v. Harding Academy of Memphis, Inc., 88 F.3d 410, 413 (6th Cir. 1996) (Section 2000e-1(a) doesn't "exempt religious educational institutions with respect to all discrimination. It merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination. Title VII still applies, however, to a religious institution charged with sex discrimination."); EEOC v. Pacific Press Publishing Ass'n, 676 F.2d 1272, 1279 (9th Cir. 1982) ("The legislative history of this exemption shows that although Congress permitted religious organizations to discriminate in favor of members of their faith, religious employers are not immune from liability for discrimination based on race, sex, national origin, or for retaliatory actions against employees who exercise their rights under the statute."); Hopkins v. Women's Div., General Bd. of Global Ministries, 238 F. Supp. 2d 174, 180 (D.D.C. 2002) (applying Title VII to a race discrimination claim against a religious employer); Elbaz v. Congregation Beth

Judea, Inc., 812 F. Supp. 802, 807 (N.D. Ill. 1992) ("By its very terms, § 2000e–1 applies only to discrimination on the basis of religion. The ban on discrimination in employment on account of race, national origin, or sex is still applicable to religious organizations.").

Title VII's statutory exemptions would apply in this case only if Mrs. Herx's claims were based on religious discrimination. But her Title VII claim alleges sex discrimination, not religious discrimination.

<u>2. Title VII's Ministerial Exception</u>

Courts recognize a "ministerial exception" to Title VII, an exception rooted in the First Amendment's Establishment and Free Exercise Clauses that bars the government from interfering with a religious employer's decision to fire one of its ministers. Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC, ___ U.S. ___, 132 S. Ct. 694 (2012). "The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." 132 S. Ct. at 706.

The Diocese says that while Mrs. Herx wasn't employed as a religion teacher, she qualified as a "minister" because the Church, the School, and the parents of students at the school expected and relied on her to perform the function of a minister every day while teaching her students. According to the

Diocese, even Mrs. Herx agreed that she was to provide students with an example of how to live their faith to share her devotion to God whenever she could. These functions, the Diocese claims, go to the heart of what makes St. Vincent de Paul School a Catholic school.

The <u>Hosanna-Tabor</u> Court declined to adopt a "rigid formula" for deciding when an employee is a minister within the meaning of the ministerial exception. Based on the facts of the case before it, the Court concluded that the exception covered Ms. Perich, based on its considerations of the following: the church held her out as a minister, giving her a distinct role from that of most church members; the church issued her a "diploma of vocation" that accorded her the title of "Minister of Religion, Commissioned," and a supplement to the diploma of vocation provided that her "skills of ministry" and "ministerial responsibilities" would be periodically reviewed by the congregation to provide for her "continuing education as a professional person in the ministry of the Gospel." 132 S. Ct. at 707. A person's eligibility to become a minister in the Lutheran Church required eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher; obtaining the endorsement of her local Synod district by submitting a petition that contained her academic transcripts, letters of recommendation, personal statement, and written answers to various ministry-related questions; and passing an oral examination by a faculty committee at a Lutheran college. That process took Ms. Perich six years, and even then the congregation had to recognize God's call to her to teach. 132

S. Ct. at 707. The Court noted that Ms. Perich held herself out as a minister, accepted the formal call to religious service, claimed a special housing allowance available only to those "in the exercise of the ministry," and, after her termination, wrote in a letter that she regarded herself as a minister. 132 S. Ct. at 707-708. Finally, the Court underscored that Ms. Perich's job was part of conveying the Church's message and carrying out its mission: she taught her students religion four times per week and led them in prayer three times per day, took students to the school chapel service once per week, led the service twice per year, and led her fourth graders in brief devotional exercises every morning. 132 S. Ct. at 708. Thus, "[i]n light of these considerations—the formal title given [Ms.] Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church—[the Court] conclude[d] that [Ms.] Perich was a minister covered by the ministerial exception." 132 S. Ct. at 708.

The Diocese hasn't shown that Mrs. Herx's teaching qualifications or job responsibilities in any way compare to Ms. Perich's situation. Nothing in the summary judgment record suggests that Mrs. Herx was a member of the clergy of the Catholic Church. Mrs. Herx has never led planning for a Mass, hasn't been ordained by the Catholic Church, hasn't held a title with the Catholic Church, has never had (and wasn't required to have) any religious instruction or training to be a teacher at the school, has never held herself out as a priest or minister, and was considered by the principal to be a "lay teacher." The religion teachers for the

15

Diocese schools have different contracts than the non-religion teachers and are required to have religious education and training. For example, Cynthia Wolf, a religion teacher in the Diocese, has a Master's Degree in Theology. Labeling Mrs. Herx a "minister" based on her attendance and participation in prayer and religious services with her students, which was done in a supervisory capacity, would greatly expand the scope of the ministerial exception and ultimately would qualify all of the Diocese's teachers as ministers, a position rejected by the <u>Hosanna-Tabor</u> Court.

Deeming Mrs. Herx a "minister" of the Catholic Church would expand the scope of the ministerial exception too far and, in fact, would moot the religious exemptions of Title VII and the ADA.

### 3. The Title VII Claim

Mrs. Herx contends that the Diocese's admission that it didn't renew her contract because she underwent in vitro fertilization treatments creates a triable fact issue as to sex discrimination because the only people who could be terminated for that reason are pregnant women and women trying to become pregnant. She says Msgr. Kuzmich and Mrs. Guffey both said that Mrs. Herx is the only teacher whose contract was not renewed for reasons unrelated to job performance and the only teacher they could recall whose contract wasn't renewed based on the morals clause of the teacher's contract. According to Mrs. Herx, forbidding non-ministerial employees from undergoing in vitro fertilization

discriminates against women because men don't (and can't) undergo the procedure.

Mrs. Herx also maintains that the Diocese's general statement that they encourage married couples to have children doesn't change things, because if the Pregnancy Discrimination arm of Title VII doesn't protect women's efforts to have children through all methods, it would let employers overrule employees' doctors.

As mentioned earlier, there are two general methods by which an employment discrimination plaintiff can prove her case. One is called the direct method, in which the plaintiff points to direct or circumstantial evidence that allows a jury to infer intentional discrimination by the employer's decision-maker. Whitfield v. International Truck and Engine Corp., 755 F.3d 438, 443 (7th Cir. 2014); Makowski v. SmithAmundsen LLC, 662 F.3d 818, 824 (7th Cir. 2011). The evidence must lead directly and without speculation to the conclusion that the decision-maker was motivated by a prohibited factor such as sex. See Harper v. Fulton County, Ill., 748 F.3d 761, 766 (7th Cir. 2014). Mrs. Herx's case satisfies that requirement.

The Diocese says Mrs. Herx's contract was nonrenewed because she underwent a type of infertility treatment that most directly affects females, and the Diocese has never non-renewed a male teacher for involvement in in vitro fertilization. Mrs. Herx's contention that this supports an inference of sex discrimination finds strength in the court of appeals' decision in Hall v. Nalco Co., 534 F.3d 644 (7th Cir. 2008), in which a private employer chose Ms. Hall as

expendable in a downsizing because she had had many absences for in vitro fertilization. The court of appeals explained, "Because adverse employment action based on childbearing capacity will always result in treatment of a person in a manner which but for that person's sex would be different, Hall's allegations present a cognizable claim of sex discrimination under Title VII." 534 F.3d at 649 (quotations marks and citation omitted).

Mrs. Herx's case isn't <u>Hall v. Nalco</u>. Ms. Hall was left unprotected in the reduction in force not specifically because of her fertility treatments, but rather because of the work absences occasioned by those treatments. Although the summary judgment record contains mention of Mrs. Herx's sick days resulting from treatments, she wasn't non-renewed for missing work. Still, as the court of appeals explained in <u>Nalco</u>, in vitro fertilization "is one of several assisted reproductive technologies that involves a surgical impregnation procedure. . . . Thus, contrary to the district court's conclusion, Hall was terminated not for the gender-neutral condition of infertility, but rather for the gender-specific quality of childbearing capacity." 534 F.3d at 648-649.

But, the Diocese says, its view of in vitro fertitilization as immoral is itself gender-neutral. The Diocese says that the treatment would be no less immoral if a male teacher agreed with his wife that they would proceed with in vitro fertilization, so the Diocese wouldn't allow the hypothetical male teacher to remain at the school, either. And a jury might well agree, after hearing evidence about the Church's view of in vitro fertilization, that an employer with so strong a view of

this particular infertility treatment would discharge anyone involved with it, male or female. But a jury wouldn't be compelled to accept that avowed gender-neutrality: the Diocese hasn't terminated any men for participation in this (or any other) infertility treatment. Evidence of what would be done carries less resonance than what has been done, and a jury that isn't required to accept a party's factual proposition is free to disbelieve evidence and draw a permissible contrary inference. Even in the face of such evidence from the Diocese, a jury that resolved every factual dispute, and drew every reasonable inference, in Mrs. Herx's favor could infer that Mrs. Herx's contract would have been renewed had she been male and everything else remained the same.

To so hold isn't to agree with Mrs. Herx's contention that the Pregnancy Discrimination Act prohibits religious organizations from drawing a line at infertility treatments they sincerely believe to be gravely immoral. The triable issue is whether Mrs. Herx was nonrenewed because of her sex, or because of a sincere belief about the morality of in vitro fertilization.

Because Mrs. Herx has shown that she could prevail at trial on her Title VII claim, the Diocese's motion for summary judgment with respect to that claim must be denied. Discussion of the indirect method of proving sex discrimination isn't needed.


B. The Americans with Disabilities Act Claim

Title I of the ADA prohibits any "covered entity" from discriminating against a "qualified individual" on the basis of disability with regard to the discharge of employees. 42 U.S.C. § 12112(a). Pursuant to the 2008 amendments, ailments substantially affecting the reproductive system are considered to be disabilities. 42 U.S.C. § 12102(2)(B) ("a major life activity . . . includes the operation of a major bodily function, including but not limited to . . . reproductive functions"). Infertility – the inability to conceive or bear offspring, BLACK'S LAW DICTIONARY 848 (9th ed. 2009) – falls within that definition. *See* Yindee v. CCH Inc., 458 F.3d 599, 601 (7th Cir. 2006) ("[S]terility . . . assuredly is a 'disability' under the ADA.").

To prevail on a claim of discrimination under the ADA, a plaintiff must demonstrate that "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, either with or without reasonable accommodation, and (3) she suffered an adverse employment action because of her disability." Hoppe v. Lewis Univ., 692 F.3d 833, 838-839 (7th Cir. 2012). The Diocese says that even if Mrs. Herx could establish those three elements, a claim of disability discrimination should fall once it is evident that the adverse employment decision was religiously based.

## 1. ADA Exemptions

Like Title VII, the ADA contains two separate provisions exempting religious entities from its coverage. The first exemption provides that a religious corporation, association, educational institution, or society isn't prohibited "from giving preference in employment to individuals of a particular religion to perform

work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 12113(d)(1). The wording of that exemption is almost identical to the exemption in Title VII, *see* 42 U.S.C. § 2000e-1(a), and the legislative history of the ADA is replete with references to Title VII and Congressional intent that the statutes' religious exemptions be applied consistently. *See, e.g.*, H.R. No. 101-485(II), at 150 (1990) ("With respect to religious entities, the bill adopts the religious preference provision from Title VII."); H.R. No. 101-485(III), at 46 (1990) ("This provision is similar to provisions included in 702 of the Civil Rights Act of 1964, and should be interpreted in a consistent manner."); *see also* 42 U.S.C. § 12117(a) ("The powers, remedies and procedures set forth in [Title VII] shall be the powers, remedies, and procedures [the ADA] provides.").

Because the first religious exemption under the ADA parallels that of Title VII, it also wasn't (for the reasons set forth in Part II-A-1 if this opinion) intended to be a blanket exemption for religious employers from application of the ADA.

The other ADA exemption offers more promise for the Diocese: it provides that a religious organization can require its employees to conform to the organization's religious tenets. 42 U.S.C. 12113(d)(2). This, the Diocese says, is exactly what it did, and then it chose not to renew Mrs. Herx's teaching contract when she failed to comply with that requirement. If those turn out to be the facts, the Diocese will prevail on this claim. But the Diocese cites no authority for the proposition that a judge can decide, as a factual matter at the summary judgment

stage, whether an adverse employment action was taken for failure to comply with an exemption-approved requirement of compliance with tenets of the faith, or was taken instead because of the employee's disability.

Mrs. Herx is entitled to a chance to show that the Diocese's proffered justification wasn't its true reason for nonrenewing her contract — that her infertility was. <u>McDonnell Douglass</u>, 411 U.S. at 804.


## 2. Permissible Inferences on this Record

Inquiry turns to whether Mrs. Herx has pointed to evidence that would allow a reasonable jury, viewing the evidence in her favor and drawing all permissible inferences in her favor, to find that her infertility caused the Diocese not to renew her contract. At the summary judgment hearing, the court expressed the tentative view that Mrs. Herx hasn't carried that summary judgment burden, and Mrs. Herx asked for leave to submit additional authority because the Diocese hadn't raised that argument. The court granted that leave.

If Mrs. Herx is correct that the Diocese never claimed entitlement to judgment because the record wouldn't allow an inference that her disability was a reason for Diocese's decision (but would allow an inference of nonrenewal based on the in vitro treatment, or the inference that it was based on her sex), the court should be very cautious about considering the argument. But apart from its faith-based arguments, the Diocese argued precisely what the court considered. Under the heading, "Herx has no evidence that the decision to not renew her teacher

contract was for anything other than Msgr. Kuzmich felt she had violated Church teachings," the Diocese argued:

> . . . Herx stated that she has no reason to believe that Msgr. Kuzmich's decision regarding the non-renewal of her contract was based on anything other than that she violated Church teachings by engaging in IVF and showed no remorse for having done so. That, in fact, was the basis for Msgr. Kuzmich's decision along with the stated need to hold teachers to the moral exemplar standard and prevent the occurrence of scandal. Church teachings on IVF would apply regardless of any disability on Herx's part.

The Diocese appears to be exactly right: all the evidence in the record indicates that the Diocese acted because of Mrs. Herx's choice of fertility treatment and not on any animus against infertility.

Mrs. Herx said at argument that discrimination against the treatment for a disability is the same as discrimination against the disability itself. If she is correct on this point, it neutralizes at least part of the ADA. The statutory exemption already discussed says a religious organization can require employees to comply with the tenets of the faith, which would seem to mean that if the Diocese considers in vitro fertilization to contravene the tenets of the faith, it can forbid its employees from receiving in vitro fertilization. But if discrimination against in vitro fertilization is the same as discrimination against the disability (infertility) it's meant to treat, 42 U.S.C. § 12112(b)(6) would seem to hold that even a religious organization couldn't prohibit in vitro fertilization because it

would have a disparate impact on infertile people. If Mrs. Herx is right about this principle of law, the First Amendment would move centrally into this litigation.

But the court reads the law differently than Mrs. Herx does. Upon being granted permission to file post-argument supplemental authorities in support of the proposition that discrimination against the treatment equals discrimination against the disability being treated, she submitted three case citations, all district court opinions. Two of those cases[2] dealt with employers who thought the treatments employees were receiving made the employees disabled within the meaning of the ADA. In Haynes v. City of Montgomery, 2008 WL 695023 (M.D. Ala. Mar. 12, 2008), a firefighter was eventually discharged because his employer didn't think he could perform his duties while taking Lexapro, which had been prescribed for his anxiety disorder. At the summary judgment stage, the district court held that a jury might find against the employer because it hadn't made an individualized decision with respect to the plaintiff and hadn't relied on current medical knowledge or available objective evidence. Id. at *4. The Haynes court didn't hold that the employer discriminated against the firefighter on grounds of his anxiety disorder simply because the employer didn't want him driving a fire truck while on Lexapro.

In Gasser v. Ramey, 125 F. Supp. 2d 1 (D.D.C. 2000), the plaintiff, a police officer with a protein deficiency, had been prescribed a blood thinner. The court

---

[2] The third case, Connolly v. First Personal Bank, 623 F. Supp. 2d 928 (N.D. Ill. 2008), dealt with an employer's misuse of a pre-hire drug test under 42 U.S.C. § 12112(d)(3)(C), and seems to present nothing of help the decision in this case.

understood that the employer confined the plaintiff to a desk job (which eliminated his chances for overtime pay) because they feared that the plaintiff would bleed severely (due to the blood thinner he was taking) were he injured on the streets. The court denied the motion for judgment on the pleadings because the defendant might have excluded the officer from a broader range of jobs than necessary.

Mrs. Herx's case is far different from <u>Haynes</u> and <u>Gasser</u>. In those cases, neither employer was said to have treated the employee differently because of the disability: an anxiety order or a protein deficiency. Instead, each employer acted adversely in the belief that the employees' medications made them unfit for their jobs — a bad truck driver due to Lexapro or a police officer vulnerable to injury due to Coumadin. Effectively, each employer acted because it saw the treatment as creating a new disability. This summary judgment record carries no support for even a suspicion that the Diocese viewed in vitro fertilization as a "disability" within the meaning of the ADA, rather than as conduct that offended the precepts of the faith.

As already explained with respect to the Title VII claim, a reasonable trier of fact could find that the Diocese chose not to renew Mrs. Herx's contract because of her gender or because of what the Diocese viewed as immoral conduct. Under no view of the summary judgment record could a reasonable trier of fact find the Diocese acted due to a disability-based animus against her infertility. The Diocese is entitled to judgment as a matter of law on Mrs. Herx's disability discrimination claim.

## C. The First Amendment

Finally, the Diocese argues that if the Title VII religious exemptions don't bar Mrs. Herx's recovery, her complaint should be dismissed because Title VII is unconstitutional as applied.[3] The Diocese maintains that to reject application of the Title VII exemptions would produce the sort of constitutionally prohibited inquiry into religious matters and values that the exemptions were designed to prevent, offending the Religion Clauses. The court doesn't see it that way.

Courts recognize the necessity of avoiding excessive entanglement and/or intrusion into religious tenets. *See, e.g.,* Rweyemamu v. Cote, 520 F.3d 198, 208 (4th Cir. 2008) (acknowledging the distinction between the "ongoing government supervision of all aspects of employment" required by the NLRA and the "limited inquiry" entailed by discrimination statutes); Geary v. Visitation of Blessed Virgin Mary Parish Sch., 7 F.3d 324, 331 (3d Cir. 1993) (court determined it could adjudicate lay teacher's ADEA claims "without the entanglement that would follow were employment of clergy or religious leaders involved"); Redhead v. Conference of Seventh-Day Adventists, 566 F. Supp. 2d 125, 135 (E.D.N.Y. 2008) ("Although the validity of defendant's religious code may not be impugned, the allegedly discriminatory application of such a code to lay employees is a proper subject of judicial scrutiny."); Smith v. Raleigh Dist. of North Carolina Conf. of United

---

[3] The Diocese made the same arguments with respect to the ADA, but the court needn't address those separately in light of the grant of summary judgment on the ADA claim.

Methodist Church, 63 F. Supp. 2d 694, 718 (E.D.N.C. 1999) ("Courts that have permitted Title VII claims against religious institutions have done so because such claims could be determined without excessive entanglement with the religious or ecclesiastical aspects of a given institution."). Courts also agree that recognition of the risk of governmental entanglement in religion prompted the development of the ministerial exception. *See, e.g.,* Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC, ___ U.S. ___, 132 S. Ct. 694, 705-706 (2012) ("Courts of Appeals have uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of [Title VII and other employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers. We agree that there is such a ministerial exception."); Schleicher v. Salvation Army, 518 F.3d 472, 474-475 (7th Cir. 2008) (noting that the ministerial exception was devised as a way of avoiding government entanglement with religious affairs when it came to the employment of "ministers"); Adams v. Indiana Wesleyan Univ., No. 3:09-CV-468, 2010 WL 2803077, at *9 (N.D. Ind. July 15, 2010) ("The ministerial exception to federal court jurisdiction is a crucially important legal doctrine, designed to prevent the federal courts from becoming entangled in the internal affairs of a church.").

The Diocese is understandably concerned about the possibility of a judge or jury conducting its own secular analysis of Roman Catholic doctrine on in vitro fertilization. That shouldn't happen. In the ordinary Title VII case, the employer

points to a non-discriminatory reason as the reason for the adverse employment action, and the plaintiff tries to prove that she suffered the adverse action because of her sex, race, national origin, and so on. In the ordinary Title VII trial, the judge instructs the jury along these lines: "In deciding Plaintiff's claim, you should not concern yourselves with whether Defendant's actions were wise, reasonable, or fair. Rather, your concern is only whether Plaintiff has proved the Defendant [adverse employment action] him [because of race/sex] . . . ." SEVENTH CIRCUIT FEDERAL JURY INSTRUCTIONS: CIVIL 3.07 (2010). The Diocese has given the court no reason to think a jury is likely to disobey that instruction in a case in which a religious employer claims to have acted for religious reasons.

## III. CONCLUSION

For all of these reasons, the court GRANTS the defendants' summary judgment motion with respect to the plaintiff's claim under the Americans with Disabilities Act, and DENIES the motion with respect to the plaintiff's claim under Title VII.

SO ORDERED.

ENTERED:   September 3, 2014

    /s/ Robert L. Miller, Jr.
Judge, United States District Court