UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| EMILY HERX, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:12-CV-122 RLM |
| | ) | |
| DIOCESE OF FORT WAYNE-SOUTH BEND, INC., | ) | |
| | ) | |
| Defendant | ) | |

## OPINION AND ORDER

A jury found that the Diocese of Fort Wayne-South Bend refused to renew Emily Herx's contract as an elementary school teacher because of her sex, and awarded her $1.95 million in compensatory damages and $1 in punitive damages. Because of the statutory cap on certain compensatory damages in Title VII suits, 42 U.S.C. § 1981a(b)(3)(D), the court reduced the compensatory damages award to $545,803. The Diocese seeks judgment as a matter of law, Fed. R. Civ. P. 50, or remittitur or a new trial under Federal Rule of Civil Procedure 59. For the reasons that follow, the court conditionally grants the motion for remittitur, defers ruling on the motion for new trial, and denies the motion for judgment as a matter of law.

I.

Mrs. Herx and her husband had struggled to have a second child. Her doctor believed *in vitro* fertilization offered their best (and perhaps only) chance. Mrs. Herx underwent two rounds of *in vitro* treatment and notified school principal Sandra Guffey before beginning each round. The first time, Mrs. Guffey expressed support and prayers. The Diocese renewed Mrs. Herx's year-to-year teaching contract after that. Mrs. Guffey learned of the second round of treatment when Mrs. Herx notified the attendance officer that she would be taking sick days to undergo the treatment; the attendance officer forward Mrs. Herx's email to Mrs. Guffey because Mrs. Herx had no more sick days to take.

Whether because Mrs. Guffey read this email more closely than she had those that came before or because she had a better understanding of church teachings (evidence in the record would support either), Mrs. Guffey realized at this point that Mrs. Herx was announcing an intention to do something the church views as gravely immoral. The tenets of the Roman Catholic Church considers *in vitro* fertilization to violate the Fifth Commandment ("Thou shalt not kill") because the procedure involves (or can involve) the freezing and discarding of embryos.

Mrs. Herx's teaching contract had what the parties call a "morals clause" that requires employees to comport themselves according to the teachings of the church. Mrs. Guffey informed Monsignor John Kuzmich about Mrs. Herx's plans for *in vitro* fertilization. Msgr. Kuzmich summoned Mrs. Herx to meet with him and

2

told her *in vitro* fertilization was a sin. This was news to Mrs. Herx, who didn't think Msgr. Kuzmich fully understood the process she was undergoing. She tried to explain to him that no embryos were being destroyed; he said he would have to research further because he understood that embryos always were destroyed. Mrs. Herx was so close to a part of the procedure that she thought it was medically impossible to stop, so she didn't agree to stop the process. Mrs. Herx thought she had Mrs. Guffey's prior approval, so she displayed no remorse to Msgr. Kuzmich.

After conferring with other leading clergy in the Diocese, Msgr. Kuzmich directed Mrs. Guffey to notify Mrs. Herx that her teaching contract wouldn't be renewed for the 2011-2012 school year. Things got really ugly after that, but this is enough background for discussion of the Diocese's motion.

II

Rule 50(b) allows a judge to set aside a jury verdict only if no reasonable basis exists in the record to support the verdict. Venson v. Altamirano, 749 F.3d 641, 646 (7th Cir. 2014). The Diocese argues that the record contains too little evidence to allow a finding that Mrs. Herx was non-renewed because she is female or because she was trying to become pregnant.

A

Some of the Diocese's argument is evidentiary. During trial, the court allowed testimony from Michael Bradley, who had gone to a strip club with other men to celebrate his birthday when he worked at the school as a teacher. Mr. Bradley testified that when his conduct came to the attention of school officials, he was sent to meet with Monsignor Kuzmich. But Msgr. Kuzmich didn't show up; he instead sent Father Gaughan. The discussion about the wrongfulness of his conduct quickly shifted to a discussion of the upcoming Cubs' season. Mr. Bradley testified that he wasn't disciplined, no one ever reviewed the morals clause with him or asked whether he had complied with it before his contract was renewed, he didn't promise not to do it again, and the only remorse he showed was telling Father Gaughan that he was sorry someone had had to meet with him. The Diocese argues that Mr. Bradley (and other men from the school who accompanied him to the strip club) were too dissimilar to Mrs. Herx and her conduct.

The Diocese's argument conflates what a Title VII plaintiff must do to defeat a summary judgment motion and what evidence might be admissible at a Title VII trial. To defeat a summary judgment motion, a Title VII plaintiff proceeding under the indirect method of proof must come forth with enough evidence to allow a finding that others not in the protected class were treated more favorably than the plaintiff was treated. *See* Gaines v. K-Five Constr. Corp., 742 F.3d 256, 263 (7th Cir. 2014) ("Because Gaines has not identified a suitable comparator, his indirect theory claims were properly defeated at summary judgment."). To make such a showing, the plaintiff ordinarily has to be able to point to a better-treated co-

employee who is substantially similar to the plaintiff in terms of transgression, disciplining supervisor, conduct record, and so on. *See, e.g.*, Taylor-Novotny v. Health Alliance Med. Plans, Inc., 772 F.3d 478, 492 (7th Cir. 2014) (summary judgment upheld where plaintiff's punctuality and attendance problems began in 2005 and proffered comparator's history of tardies only started in 2010); Zayas v. Rockford Memorial Hosp., 740 F.3d 1154, 1158 (7th Cir. 2014) (summary judgment affirmed: "Zayas lacks evidence tending to show a similarly situated employee, who is not Puerto Rican or under the age of 40, that engaged in similarly unprofessional communications, and was not disciplined for it."). The Diocese might well be right that Mr. Bradley and his co-partiers weren't sufficiently similar to Mrs. Herx for this summary judgment purpose.

The Diocese's argument falls short for two reasons.

First, Mrs. Herx didn't need to show *prima facie* case-quality comparators at the summary judgment stage because she made an adequate showing under the direct method of proof. *See* Docket No. 135, at 16-19. The direct method of proof can include circumstantial evidence, Whitfield v. International Truck and Engine Corp., 755 F.3d 438, 443 (7th Cir. 2014) ("A plaintiff may prevail by 'constructing a convincing mosaic of circumstantial evidence that allows a [factfinder] to infer intentional discrimination by the decisionmaker.'") (*quoting* Phelan v. Cook County, 643 F.3d 773, 779 (7th Cir. 2006)); Harper v. Fulton County, Ill., 748 F.3d 761, 765 (7th Cir. 2014) ("Should the plaintiff lack direct evidence, she may also point to circumstantial evidence that allows a jury to infer

5

intentional discrimination by the decision-maker."), and doesn't always require a showing of better treatment of a similarly situated co-employee.

Second, once a Title VII case proceeds to trial, the indirect method of proof — including the showing of comparators — doesn't matter. The jury isn't asked to evaluate whether the plaintiff has shown the *prima facie* required by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or even instructed on that test. Once the case gets to trial, the only issue the jury decides is whether, based on all the evidence in the case, it's more likely than not that things would have been different had the plaintiff not been in the protected class and everything else remained the same.

> The true issue when reviewing this grant of judgement as a matter of law, is not whether Greene was able to jump through the McDonnell Douglas Double Dutch, but whether she presented sufficient direct or circumstantial evidence from which a rational jury could find that she was discriminated against because of her gender.

Greene v. Potter, 557 F.3d 765, 769 n.1 (7th Cir. 2009). That's what this jury was asked to decide. *See* Final Jury Instruction No. 10 (Doc. 203). The similarity of comparators simply isn't something the plaintiff has to show at trial. Runyon v. Applied Extrusion Technologies, Inc., 619 F.3d 735, 739 (7th Cir. 2010) (burden-shifting analysis inappropriate at Rule 50 stage).

At trial, evidence of the employer's treatment of other employees is admissible if the evidence is relevant — if it tends to make a fact any more or less probable and the fact is of consequence to deciding the case, Fed. R. Evid. 401 —

6

and its probative value isn't substantially outweighed by the risk of unfair prejudice confusing the jury or wasting time. Fed. Evid. R. 403.

Because of its dissimilarity from Mrs. Herx's conduct, the strip club evidence had modest probative value. But it had some probative value as the only instance (as far as this record showed) in which a male employee's conduct was known to the Diocese as potentially running afoul of the "morals clause." There was very little risk of unfair prejudice or jury confusion: jurors can easily understand that going to a strip club isn't in the same league as *in vitro fertilization* in the eyes of an institution that believes *in vitro* fertilization violates the commandment that one shall not kill. The Diocese could, and did, present testimony to that effect.

Nothing about the evidence of the trip to the strip club warrants a new trial.

B.

Ample evidence supports the jury's determination that the Diocese didn't renew Mrs. Herx's contract because of her sex. Officials from the Diocese testified that a male teacher whose wife was undergoing in vitro fertilization would be fired, but Mrs. Herx presented evidence from which the jury could have inferred the opposite.

The Diocese provided no instruction as to how principal Guffey (or her superiors, for that matter) were to enforce the morals clause in the teachers' contracts. The jury could have inferred that the policy was one of indifference

unless a transgression came to light, such as when word of the strip club visit got around school, or when Mrs. Guffey divorced and remarried, or when a teacher wed in a Lutheran church. At those points, the Diocese stepped in and took what it considered the appropriate action. Otherwise, nobody asked teachers if they were living their lives consistent with the morals clause.

Mrs. Herx rightly describes this as a "don't ask, don't tell" policy. When Msgr. Kuzmich met with Mrs. Herx, he told her that their meeting wouldn't have been needed if she hadn't raised the issue or talked to others about it, but since she did so there was a possibility of scandal. *In vitro* fertilization treatment is harder for a female teacher to keep quiet than it would be for a male. The female teacher can't teach at school when her body is needed for the treatment, so she needs to miss work. Hall v. Nalco Co., 534 F.3d 644 (7th Cir. 2008). The "don't ask, don't tell" approach undercuts the testimony that a male teacher would be dismissed if his wife underwent *in vitro* fertilization.

As mentioned before, things got ugly after Mrs. Herx was let go. The Diocese's school superintendent, Dr. Mark Meyers, noticed that the school handbook said nothing about the morals clause or *in vitro* fertilization, so he proposed an amendment to the handbook. The bishop approved the change ten months later. The amended policy reads, "Any diocesan employee who obtains an abortion by any means, or who participates in *in vitro* fertilization or any other practice or procedure which, by design or related process, results in the unnatural destruction of human embryos, will be denied the privilege of continuing her

8

employment with the diocese, subject to an appeal to the Bishop." That this policy is limited to women ("her employment") isn't quite a smoking gun, but provides a solid base for an inference that Mrs. Herx's contract wouldn't have been non-renewed had she been male.

There was other evidence, as well. Father Mark Gurtner, a cannon lawyer with the Diocese, testified that in the eyes of the church, contraception is just as bad as *in vitro* fertilization ("gravely immoral, intrinsically evil") and no circumstances can justify it. Msgr. Kuzmich's testimony that if he saw a male teacher drop a package of condoms, he would pick the package up and return it to the teacher, provides further support for an inference that the morals clause isn't enforced evenly between men and women. Evidence that neither the principal nor the supervising Monsignor received any training in avoiding sex discrimination in the workplace provides more support for that inference.

The evidence in this trial record could support a verdict for either side. A reasonable jury could have accepted the testimony that a male teacher would have been treated the same way, and found for the Diocese. But this jury drew permissible inferences that a male teacher wouldn't have been treated the same way, and found for Mrs. Herx. The evidence supports that verdict.

The same evidence supports an inference that Mrs. Herx wouldn't have been discharged had she not been trying to become pregnant.

III

In its motion for remittitur or a new trial, the Diocese contends that the record contains too little evidence to support a back pay award, or to support an award for lost health insurance benefits, or to support an award for lost tuition. If a damages award isn't rationally connected to the evidence, a court can order a remittitur, if the plaintiff is willing to accept it, or a new trial if the plaintiff is unwilling. International Fin. Servs. Corp. v. Chromas Technologies Canada, Inc., 356 F.3d 731, 739 (7th Cir. 2004).

The jury awarded Mrs, Herx $75,000 for lost wages and benefits, and the court increased that amount to $118,803 when addressing the statutory damages cap. The Diocese challenges three aspects of that award.

Back Pay. The parties stipulated to the pay Mrs. Herx would have received had she continued to teach at the school through June 2014. That back pay totaled $88,450. Mrs. Herx testified at trial that unemployment compensation was her only income from June 2011 to April 2012. In April 2012, she got a part-time job with a on-line education organization, with her salary fluctuating depending on how many students there were. She testified that, at times, her salary with the on-line employer was half what it would have been had she still been teaching for the Diocese. On January 1, 2014, Mrs. Herx became a full-time employee of the on-line teaching organization, and began making about 20 percent more than she would have made as a teacher for the Diocese.

The Diocese says the $88,450 can't be right as a calculation of Mrs. Herx's lost wages. That's what she would have lost had she been without income for the

entire three school years between her non-renewal and trial. But she wasn't without income: she worked part-time from April 2012 to January 2014, and full-time after that.

Mrs. Herx responds with an accurate statement of law: defendant bears the burden of proving failure to mitigate damages. From this, Mrs. Herx reasons that the Diocese can't complain about the back pay award because the Diocese didn't meet its burden — indeed, never mentioned damages — at trial. That argument misapprehends the nature of the Diocese's argument. Failure to mitigate is the failure to make a reasonable effort to find other employment. Lawson v. Trowbridge, 153 F.3d 368, 377 (7th Cir. 1998) ("The doctrine is simple: 'when a tort victim fails to take reasonable steps to mitigate his damages, those damages are either cut down or eliminated altogether under the principle of 'avoidable consequences.'") (*quoting* Brooks v. Allison Div. of General Motors Corp., 874 F.2d 489, 490 (7th Cir. 1989)).

The Diocese isn't arguing that Mrs. Herx failed to mitigate; it argues that Mrs. Herx *did* mitigate her damages and so isn't entitled to a recovery of back pay to the extent she replaced what otherwise would have been lost income.

Mrs. Herx also argues that the Diocese's silence at trial on the issue of damages sandbagged her proof at trial. She says that had the Diocese given any sign of contesting damages, she easily could have placed her tax forms into evidence. It might not have been quite that easy had the issue arisen at trial because Mrs. Herx's W-2s don't appear to have been listed as exhibits in the

11

pretrial order. In any event, to not challenge evidence of damages is not to waive the requirement that damages be limited to what the plaintiff proved. Because Mrs. Herx had earnings during the period for which seeks back pay, an award of the entire amount the Diocese would have paid her is excessive.

The Diocese contends that because the award is excessive, the court must either award no damages for back pay, or grant a new trial on at least that issue. The Diocese cites Taylor v. Philips Indus., Inc., 593 F.2d 783, 786-787 (7th Cir. 1979). The Taylor court didn't zero out the damages; it remanded for determination of the amount of other income that needed to be subtracted from the plaintiff's lost wages. It's interesting to consider the significance of Taylor having been decided before Title VII claims were tried by juries and the Rule 59 standard came into play. But that issue needn't be decided.

Unlike Taylor, this record allows a calculation of the minimum Mrs. Herx lost in back pay. She is entitled to the full amount of what she would have earned as a teacher from the Diocese from June 2011 to the beginning of April 2012 (the record doesn't show what April date Mrs. Herx became an independent contractor with the online program). That amounts to $22,516.67 ($28,950 ÷ 9 months x 7 months). She isn't entitled to anything after January 1, 2014 when she became a full time employee and her income exceeded what the Diocese would have paid her. So for the 2013-2014 school year, she lost no more than $10,050.00 ($30,150 ÷ 9 months x 3 months in 2013).

The record shows that while Mrs. Herx worked part-time as an independent contractor, there were times — the record doesn't say when or how often — that her pay was as much as half of what she would have made at the school. The difference between what Mrs. Herx made and what she should have made can't be calculated precisely, but there is no evidence that her non-Diocese earnings were ever more than half her Diocese pay until she went full-time with the online organization in January 2014. So this record supports the proposition that Mrs. Herx lost at least half the pay she would have made between becoming an independent contract in April 2012 and going full-time in January 2014. The evidence, then, supports a back pay award with the following components:

2011-2012 school year: 2 months = 6,433.33 ÷ 2 = $3,216.66

2012-2013 school year: full year = 29,350 ÷ 2 = $14,675.00

2013-2014 school year: 3 months = $10,050 ÷ 2 = $5,025.00

In all likelihood, there were months when Mrs. Herx made less than half of what she would have made with the Diocese, but this record doesn't allow that calculation. The record supports a back pay award of $22,916.66.

<u>Lost Benefits</u>. The jury's lost wages and benefits award included $22,853 due to the loss of the Diocesan health insurance as Mrs. Herx's primary health insurance. The Diocese says there is no evidence to support that award.

The Diocese is mistaken. Mrs. Herx's husband Brian calculated that figure and explained how he did it. He and Mrs. Herx both had health insurance through their employers, and his policy served as a backup for what Mrs. Herx's policy

13

didn't cover. Mr. Herx, who is an accountant, testified that he had gone over the family finance records and located out-of-pocket payments of medical expenses for Mrs. Herx that health insurance would have covered when the couple had two insurers. Mr. Herx also testified that those out-of-pocket expenses were above and beyond the medical care that flowed from the non-renewal of the teaching contract (another category of damages covered those).

A jury presented with cross-examination or argument might have wanted something more than Mr. Herx's say-so, but the law didn't compel more. The jury credited Mr. Herx's testimony, and his testimony provides ample support for the lost benefits award of $22,853.

<u>Tuition Benefits for Son</u>. Part of Mrs. Herx's compensation for teaching for the Diocese was tuition for her son. Mrs. Herx's son was in kindergarten at the school when her employment ended, and she moved her son to a public school. The jury awarded $7,000 for lost tuitions benefits, consisting of two-and-a-half years of tuition at $3,000 a year. The Diocese says Mrs. Herx suffered no damages of this sort, and has presented two arguments. Neither argument is the slightest bit persuasive.

First, the Diocese says, Mrs. Herx wasn't asked to take her son out of its school; she and her husband made that choice on their own. But Mrs. Herx doesn't claim damages for her son's inability to attend the Diocese school. She claims damages because free tuition was part of her compensation as a teacher;

14

once she was no longer a teacher, she could no longer get free tuition for her elementary school-aged son.

Second, the Diocese says, Mrs. Herx mitigated the damage by placing her son in a public school. This argument, too, badly misses the mark: Mrs. Herx doesn't claim the Diocese robbed her son of the ability to get an education. As long as Mrs. Herx worked at the school and had an elementary school-aged child, Mrs. Herx had a right to send her son, without additional cost to her, to a school for which the Diocese charged $3,000 a year in tuition. By deciding not to renew her contract because of her sex, the Diocese took that right — a right worth $3,000 a year — from Mrs. Herx.

The record supports a lost benefits award of $7,000 to reflect the loss of the tuition benefit.

IV

As it stands, the jury award (as modified by the January 12, 2015 ruling on the motion to enforce the statutory cap) is $418,803, consisting of $299,999 in compensatory damages, $1 in punitive damages, $88,450 for back pay, $7,500 for lost tuition, and $22,853 for lost health insurance benefits. That award is excessive because it includes a back pay component that isn't supported by the evidence. A remittitur to $22,916.66 for the back pay component, producing a total award of $353,269.66, will keep the award within the range supported by the

evidence. If the plaintiff doesn't agree to the remittitur, the court will grant a new trial limited to the amount of damages to be awarded for back pay.

Accordingly, the court DENIES the defendant's renewed motion for judgment as a matter of law and DEFERS ruling on the alternative motion for remittitur or new trial [docket # 218] until the plaintiff notifies the court whether she will accept the remittitur.

SO ORDERED.

ENTERED:   March 9, 2015

  /s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Judge
United States District Court